1

1           ROUGH DRAFT

2     UNITED STATES DISTRICT COURT

3     SOUTHERN DISTRICT OF NEW YORK

4     Case No. 07CV3782

5     - - - - - - - - - - - - - - - - - -x

6     MARK KAPITI,

7                         Plaintiff,

8           -against-

9     RAYMOND W. KELLY, in his official
      Capacity as Commissioner of the New York
10    City Police Department, Property Clerk,
      NEW YORK CITY POLICE DEPARTMENT, and THE
11    CITY OF NEW YORK,

12                        Defendants.

13    - - - - - - - - - - - - - - - - - -x

14                        100 Church Street
                          New York, New York
15
                          May 28, 2008
16                        10:40 a.m.

17

18        DEPOSITION of GEORGE TRIFFON, a

19    non-party witness in the above-entitled

20    action, held at the above time and place,

21    taken before Brian Glickman, a Shorthand

22    Reporter and Notary Public of the State of

23    New York, pursuant to the Federal Rules of

24    Civil Procedure, Notice and stipulations

25    between Counsel.

2

```
 1              ROUGH DRAFT

 2    A P P E A R A N C E S:

 3

 4    LAW OFFICES OF STEVEN L. KESSLER, ESQ.
              Attorneys for Plaintiff
 5            122 East 42nd Street
              New York, New York York 10168
 6
      BY:   STEVEN L. KESSLER, ESQ.
 7          StevenKessler@MSN.com

 8

 9

10

11
      NEW YORK CITY LAW DEPARTMENT
12    OFFICE OF THE CORPORATION
      COUNSEL
13            Attorneys for Defendants
              100 Church Street
14            New York, New York 10007-2601

15     BY:  DAVID HAZAN, ESQ.

16          PHILIP FRANK, ESQ.

17

18

19

20            *      *      *
21

22

23

24

25
```

3

```
1              ROUGH DRAFT

2           S T I P U L A T I O N S

3

4       IT IS HEREBY STIPULATED BY AND BETWEEN

5    the Parties hereto through their

6    respective counsel that all objections

7    except as to the form of the question

8    shall be reserved to the time of trial;

9       IT IS FURTHER STIPULATED by and

10   between the parties hereto through their

11   respective counsel that sealing,

12   certification and filing shall be and the

13   same are hereby waived;

14       IT IF FURTHER STIPULATED that the

15   within examination may be signed and sworn

16   to before any Notary Public with the same

17   force and effect as if signed and sworn to

18   before this Court.

19

20

21

22

23

24

25
```

4

```
 1              ROUGH DRAFT

 2  G E O R G E    T R I F F O N, the witness

 3  herein, having been sworn by the Notary

 4  Public, was examined and testified as

 5  follows:

 6  EXAMINATION BY

 7  MR. KESSLER:

 8      Q      Would you please state your name

 9  for the record.

10      A      George Triffon.

11      Q      Please state your business

12  address for the record.

13      A      1 Police Plaza, New York, New

14  York 10038.

15      Q      Good morning, Sergeant.

16      A      Good morning.

17      Q      Nice to see you.

18      A      Likewise.

19      Q      Have you ever been deposed

20  before?

21      A      Once before.

22      Q      Have you ever testified in

23  court?

24      A      I have.

25      Q      How many times, approximately?
```

```
 1            ROUGH DRAFT

 2     A     Would you specify what kind of

 3   court?

 4     Q     You tell me.

 5     A     Traffic court, more times than I

 6   can count.

 7     Q     Criminal cases?

 8     A     A criminal case in front of the

 9   grand jury once.

10     Q     I'll give you a brief rundown of

11   what we're going to do today.  You know

12   why you're here, you know what case this

13   is about?

14            MR. HAZAN:  Objection.

15            You can answer.

16     A     I know the name.  That is it.

17     Q     I have some questions to ask you

18   about a pending case that my client, Mark

19   Kapiti, is a plaintiff in.  I would

20   appreciate if you would answer the

21   questions.  If you don't understand any of

22   the questions, feel free to ask me.  If

23   you have a question you want to ask your

24   attorney, feel free to do so.  And if for

25   any reason you want to stop the proceeding
```

6

```
 1              ROUGH DRAFT
 2   please let me know.  Hopefully I'll get
 3   you out of here relatively soon.
 4              A little background first.
 5   What's your education?  Where did you go
 6   to college?
 7        A    I went to John Jay College of
 8   Criminal Justice for a bachelor's degree,
 9   and I went to New York Law School for my
10   JD, for Juris Doctor.
11        Q    When did you graduate from John
12   Jay?
13        A    1996.
14        Q    New York Law School?
15        A    2007.
16        Q    Who was your favorite teacher?
17             MR. HAZAN:  Objection.
18        Q    In between 1999 and 2004, what
19   were you doing as employment?
20        A    Between 1999 and 2004?
21        Q    From the time you graduated from
22   John Jay until you started law school.
23        A    The bulk of that time was spent
24   as a police officer in the New York City
25   Police Department.
```

```
 1              ROUGH DRAFT

 2      Q       While you were attending New

 3   York Law School, were you still employed

 4   by the New York City Police Department?

 5      A       I was.

 6      Q       When were you admitted to the

 7   New York bar?

 8      A       In March of 2008.

 9      Q       Congratulations.

10      A       Thank you.

11      Q       What is your title with the NYPD

12   now?

13      A       Presently I'm a sergeant for the

14   New York City Police Department.

15      Q       Out of where?

16      A       I work in the First Precinct.

17      Q       How long have you been with the

18   NYPD?

19      A       I was first hired in April of

20   1997.

21      Q       What did you do from 1997 until

22   present with the NYPD?

23              MR. HAZAN:  Objection to form.

24      Q       You can answer.

25      A       Various patrol functions and
```

8

```
 1            ROUGH DRAFT

 2   ultimately then I was transferred to the

 3   legal bureau.

 4      Q     When were you transferred to

 5   legal?

 6      A     Summer of 2005.

 7      Q     So in 2006, where were you

 8   employed within the NYPD?

 9      A     I was working for the Civil

10   Enforcement Unit which is a division of

11   the legal bureau.

12      Q     Where is that?

13      A     The physical office itself?

14      Q     Yes.

15      A     Is located at 2 Lafayette Street

16   in New York City, New York.

17      Q     Is that where your office was?

18      A     Correct.

19      Q     Did you review any documents

20   before you came to be deposed today?

21           MR. HAZAN:  Objection to the

22        extent that he reviewed documents with

23        his attorney that would be privileged,

24        but otherwise he can answer the

25        question.
```

9

```
 1              ROUGH DRAFT
 2              MR. KESSLER:  Not whether he
 3         reviewed documents.  I didn't ask
 4         anything yet.  I'm just asking if he
 5         reviewed documents.
 6         A    Yes.
 7         Q    Did you bring any with you?
 8         A    No.
 9         Q    Did you talk with anyone about
10    the case prior to today's deposition?
11         A    Yes.
12         Q    Who?
13         A    My attorney.
14         Q    Would that be Mr. Hazan?
15         A    Correct.
16         Q    Anyone else you spoke with?
17         A    No.
18         Q    Did you speak with anyone within
19    the police department about this case
20    before testifying?
21         A    No, other than to the extent
22    that I told my former supervisor at CEU
23    that I would be deposed about the case.
24    But that's the extent.
25         Q    Did you discuss the substance of
```

```
 1          ROUGH DRAFT
 2   the case with him?
 3       A    No.
 4       Q    For the purpose of today's
 5   deposition, is Mr. Hazan your attorney?
 6       A    Yes.
 7       Q    Now, you are not named as a
 8   defendant in the caption and yet you have
 9   been provided to me for a deposition, do
10   you know why?
11       A    No, I don't.
12       Q    When did you talk about the case
13   with Mr. Hazan prior to coming today?
14       A    Tuesday, the 20th of this month.
15       Q    That would be last week?
16       A    Last Tuesday, correct.
17       Q    Did he show you any documents?
18       A    Yes.
19       Q    What documents did he show you?
20            MR. HAZAN:  Objection.
21            MR. KESSLER:  If they are part
22       of the file, I'll ask that they be
23       produced.
24            MR. HAZAN:  It's attorney-client
25       privilege what I showed to my client,
```

11

```
 1              ROUGH DRAFT
 2      what documents I showed to my client
 3      in preparation for this, it's also
 4      work product privilege.
 5              MR. KESSLER:  We're going to
 6      mark that for a ruling.
 7      Q      Did you make any notes in
 8   preparation for the deposition today?
 9      A      No.
10      Q      Let's turn to your work with the
11   NYPD.  Right now you indicated you are
12   with the First Precinct?
13      A      Correct.
14      Q      When did you leave the Civil
15   Enforcement Unit?
16      A      In January of 2008.
17      Q      So you were there from summer of
18   '05 to January of '08?
19      A      Correct.
20      Q      Focussing on your time with the
21   Civil Enforcement unit, other than
22   yourself, how many people worked there
23   within the unit?
24              MR. HAZAN:  Objection to form.
25      Q      You can answer.
```

12

```
 1              ROUGH DRAFT
 2      A    I would estimate about 20.
 3      Q    Of those approximately 20, are
 4  they all police officers?
 5      A    No.
 6      Q    How many of them are police
 7  officers?
 8      A    An estimate, half.  About ten.
 9      Q    And of those who are not police
10  officers, are the others attorneys?
11      A    An estimate about eight out of
12  the remaining ten.
13      Q    And the remaining two would be
14  what?
15      A    Neither police officers nor
16  attorneys.
17      Q    Secretarial or support staff?
18      A    Correct.
19      Q    Of the police officers there,
20  how many have legal degrees, if you know?
21      A    I don't know.  An estimate,
22  about half.
23      Q    What types of cases does the
24  Civil Enforcement Unit handle?
25           MR. HAZAN:  Objection to form.
```

13

```
 1              ROUGH DRAFT

 2     A      Forfeiture, civil forfeiture

 3  cases.

 4     Q      Is that all?

 5     A      To my knowledge.

 6     Q      The civil forfeiture cases that

 7  they handle, is there a statute that

 8  governs those proceedings?

 9             MR. HAZAN:  Objection.

10     A      There is applicable law, I

11  couldn't tell you what the statute is

12  offhand.

13     Q      In January of '06, approximately

14  how many cases did you handle, what was

15  your case load?

16     A      I'll need you to be more

17  specific in terms of my role in certain

18  cases.

19     Q      Well, why don't you tell me

20  then, what did you do in the Civil

21  Enforcement Unit in January of '06?

22             MR. HAZAN:  Objection to form.

23     A      I can't recall specifically

24  January of '06.

25     Q      In general, during your time in
```

14

```
 1              ROUGH DRAFT
 2   civil enforcement what were your duties?
 3             MR. HAZAN:  Objection to form.
 4      A     My function was primarily
 5   administrative.
 6      Q     Meaning what?
 7      A     Sending mailings, preparing in
 8   office memos.  As well as I was a
 9   representative for the Police Department
10   at retention hearings at the office of
11   administrative trials and hearings.
12      Q     We call those OATH hearings?
13      A     We do.
14      Q     And those would have been your
15   duties during the time you were at civil
16   enforcement, correct?
17             MR. HAZAN:  Objection.
18      A     During my entire time at civil
19   enforcement?
20      Q     Yes.
21      A     I will not say that that's an
22   all inclusive or exhaustive list, to the
23   best of my memory that is what my function
24   was.
25      Q     Can we say in 2006 those were
```

```
 1              ROUGH DRAFT

 2   your functions while in civil enforcement?

 3              MR. HAZAN:  Objection to form.

 4       A     Again, I can't say with

 5   certainty that was exactly what I was

 6   doing, but generally speaking, my time at

 7   civil enforcement that's what I was doing.

 8       Q     How many seizure cases have you

 9   handled or been assigned during your time

10   at civil enforcement?

11              MR. HAZAN:  Objection to form.

12       A     The office itself handles about

13   4,000 a year.  My part in each of them

14   varies depending on the case.

15       Q     From 2005 to the present, or to

16   January of '08, was that number 4,000

17   constant?

18              MR. HAZAN:  Objection to form.

19       A     Explain what you mean by

20   constant.

21       Q     Was it 5,000 one year, 2,000

22   another year, 3,000 a third year, or was

23   it approximately 4,000 every year?

24       A     I couldn't say, 4,000 is my

25   guess, an estimate rather.
```

16

```
 1              ROUGH DRAFT

 2      Q      How are you coming up with that

 3  number?  That's what I'm asking.

 4      A      The cases are numbered, the

 5  highest numbers I can recall in any given

 6  year I worked there were in the 4,000

 7  range.

 8      Q      And do they start at zero every

 9  year?

10      A      They do, start at one rather.

11      Q      Correct.  Did you ever conduct

12  any hearings under the administrative code

13  in the Supreme Court New York County while

14  you were in the civil enforcement unit?

15          MR. HAZAN:  Objection to form.

16      A      I'm sorry.  Repeat the question

17  for me.

18      Q      Did you ever conduct any

19  hearings under the administrative code in

20  Supreme Court New York County while you

21  were in civil enforcement?

22      A      I did not conduct any hearings

23  in Supreme Court of New York County.

24      Q      You have never?

25      A      No.
```

```
 1              ROUGH DRAFT

 2      Q      In addition to the term OATH

 3   hearing, how else are they referred to,

 4   are they called Krimstock hearings?

 5      A      I have heard that term applied

 6   to them.

 7      Q      On average during your time with

 8   civil enforcement, how many OATH hearings

 9   or Krimstock hearings would you handle on

10   a typical day?

11              MR. HAZAN:  Objection to form.

12      A      I was typically assigned several

13   per week.  They did not all go to hearing.

14      Q      How many would go to hearing on

15   average?

16              MR. HAZAN:  Objection to form.

17      A      I couldn't say, I do not know.

18      Q      Most?

19              MR. HAZAN:  Objection.

20      A      Define "most" for me.

21      Q      Well, let's talk about the

22   resolution of the Krimstock case.  You

23   said not all of them went to a hearing,

24   correct?

25      A      Correct.
```

```
 1              ROUGH DRAFT

 2      Q      Those that did not go to a

 3  hearing, what would happen?

 4              MR. HAZAN:  Objection.

 5      A      Typically the ones that did not

 6  go to hearing would be settled with the

 7  titled owner of the car if, in fact, it

 8  was a car at issue.

 9      Q      Was there anything else other

10  than cars that you dealt with?

11      A      Personally, no.

12      Q      And that settlement with the

13  owner would come downtown on Rector Street

14  or prior to appearing at the OATH hearing?

15              MR. HAZAN:  Objection to form.

16      A      Both depending on the case, both

17  or either I should say.

18      Q      Approximately to your best

19  estimate, how many OATH hearings did you

20  conduct while at civil enforcement?

21              MR. HAZAN:  Objection to form.

22      A      I don't know.

23      Q      Ten?

24      A      At least.

25      Q      Fifty?
```

19

```
 1              ROUGH DRAFT

 2     A      I couldn't say.

 3     Q      Between 10 and 50,

 4  approximately?

 5     A      It would be an estimate, I

 6  couldn't say for sure.

 7     Q      Would that be a fair estimate

 8  for a range?

 9     A      That would be a fair estimate

10  for a range.

11     Q      Okay.  Of the total number of

12  cases that you handled, approximately how

13  many resulted in the return of the vehicle

14  to the owner?

15     A      Again, I can't say how many

16  cases I handled and how many settled and

17  therefore, I certainly couldn't estimate

18  how many were given back.

19     Q      Do you know as far as the office

20  as a whole, you used the figure 4,000

21  before, of those 4,000 cases in a year,

22  how many resulted in the return of the

23  vehicle to the owner?

24              MR. HAZAN:  Objection.

25     A      I couldn't say.  I do not know.
```

```
 1              ROUGH DRAFT

 2     Q      Were the procedures used for

 3   Krimstock hearings constant or consistent

 4   during the time that you were at civil

 5   enforcement --

 6              MR. HAZAN:  Objection.

 7     Q      -- or did they change at some

 8   point?

 9     A      You would have to be more

10   specific, I couldn't say.

11     Q      Were there any policies

12   governing the OATH hearings that you

13   conducted?

14              MR. HAZAN:  Objection.

15     A      I really couldn't say.  I mean,

16   each case was handled individually.

17              MR. KESSLER:  Off the record.

18              (Discussion off the record.)

19     Q      Back on the record.

20              When you say that each case was

21   handled individually, were there any rules

22   that governed your actions as a member of

23   the civil enforcement unit that you had to

24   abide by in handling the case?

25              MR. HAZAN:  Objection.
```

```
 1              ROUGH DRAFT

 2     A     You'd have to clarify what you

 3   mean by "rules".

 4     Q     If I did that, I'd be telling

 5   you what I'm thinking about, but, is there

 6   anything in the administrative code that

 7   governed your proceedings, is there

 8   anything under Krimstock that governed

 9   your actions, is there anything in the

10   property clerk manual that governed your

11   actions?

12           MR. HAZAN:  Objection to form.

13     A     I mean, I can only answer based

14   on my memory and I don't recall any

15   specific rules or procedures that you are

16   referring to.

17     Q     That's all I'm asking for.

18           When you were in civil

19   enforcement, did you have a supervisor?

20     A     I did.

21     Q     Who was that?

22     A     The bulk of the time I was there

23   was a woman named Eva Marie Russo.

24     Q     What was Ms. Russo's position in

25   the unit?
```

22

```
 1              ROUGH DRAFT

 2      A     Her job title is deputy managing

 3   attorney.

 4      Q     Is there someone above her?

 5      A     There was.

 6      Q     Who is that?

 7      A     The executive officer of the

 8   unit, Robert Fodera.

 9      Q     What were Mr. Fodera's duties at

10   the time?

11              MR. HAZAN:  Objection.

12      A     I couldn't say he was my

13   supervisor, supervisor, that's the extent

14   of my knowledge.

15      Q     Did you ever deal with him

16   directly?

17      A     Yes.

18      Q     Why, why would you deal with him

19   as opposed to your immediate supervisor?

20      A     It is a small office.  I

21   couldn't say specifically.

22      Q     And were there any decisions

23   that Mr. Fodera would make that would be

24   beyond the scope of Ms. Russo's job title?

25              MR. HAZAN:  Objection.
```

```
 1              ROUGH DRAFT

 2      A    I couldn't say.

 3      Q    Did Mr. Fodera have a

 4   supervisor?

 5      A    Yes.

 6      Q    Who was that?

 7      A    That would be the commanding

 8   officer of the unit, Robert Messner.

 9      Q    Is Mr. Messner a police officer?

10      A    No.

11      Q    Is Mr. Fodera?

12      A    No.

13      Q    Are they both attorneys?

14      A    To my knowledge.

15      Q    And what about Ms. Russo, is she

16   a police officer?

17      A    No.

18      Q    Is she an attorney?

19      A    As far as I know.

20      Q    Did Mr. Messner have a

21   supervisor?

22      A    I couldn't say who his

23   supervisor was.

24      Q    Did you ever deal with someone

25   named John Curry?
```

```
 1              ROUGH DRAFT

 2      A     Sure.

 3      Q     What was his title?

 4      A     I believe he was another

 5  executive officer.

 6      Q     Similar to?

 7      A     Robert Fodera.

 8      Q     All right.  As far as you know,

 9  has the structure of the Civil Enforcement

10  Unit changed since you've left?

11      A     I don't know.

12      Q     Let's focus on this case.  Do

13  you have any independent recollection as

14  to what happened in this case?

15      A     Specifically?

16      Q     About the vehicle seizure.

17      A     I have no independent

18  recollection of this case.

19      Q     Other than you being called to

20  testify today, do you recall anything out

21  of the ordinary or unusual in the way your

22  office handled this case?

23            MR. HAZAN:  Objection to form.

24      A     I do not recall anything.

25      Q     What role did you play with
```

```
 1              ROUGH DRAFT

 2    regard to this case, the Kapiti case?

 3        A      Again, I have no independent

 4    recollection of my role.

 5        Q      Do you recall when you became

 6    involved in it?

 7        A      I do not.

 8        Q      Do you remember when the vehicle

 9    was seized?

10        A      I do not.

11               MR. KESSLER:  Off the record.

12               (Discussion off the record.)

13               MR. KESSLER:  Could you mark

14         these, please, as Plaintiff's 1

15         through 11.

16               (Marked Plaintiff's Exhibits 1

17         through 11 for identification as of

18         today's date.)

19               MR. HAZAN:  The witness requests

20         a copy of the transcript from

21         plaintiff pursuant to the federal

22         rules so that he can review and

23         correct it for any errors that may be

24         contained in the transcript.

25               MR. KESSLER:  I'm still waiting
```

```
 1              ROUGH DRAFT

 2      for mine, by the way.

 3              MR. HAZAN:  We haven't gotten it

 4      yet.

 5              MR. KESSLER:  Really.

 6      Q      Okay.  Do you remember when Mr.

 7      Kapiti's vehicle was seized?

 8      A      I don't.

 9      Q      Let me show you what has been

10      marked as Plaintiffs' Exhibit 3, and tell

11      me if this refreshes your recollection?

12              MR. HAZAN:  As to what?

13      Q      As to when Mr. Kapiti's vehicle

14      was seized, that was my question.

15      A      It does not refresh my

16      recollection.  The letter does seem to

17      indicate when it was seized, but it does

18      not refresh any independent recollection

19      on my part.

20      Q      Let's talk about the letter.  Is

21      that your signature at the bottom?

22      A      It is.

23      Q      And this document, do you see on

24      the bottom right is Bates stamped NYC 14

25      that was produced by the City in discovery
```

27

```
 1              ROUGH DRAFT

 2    in this case?  We'll talk about this a

 3    little more in a minute.  Hold onto it.

 4    This indicates that April 23rd, '06 was

 5    the date the vehicle was seized; is that

 6    correct?

 7        A     That's what the letter reads,

 8    yes -- excuse me, 2005.

 9        Q     Excuse me April 23, 2005?

10        A     Yes.

11        Q     Let me refer you to Plaintiff's

12    Exhibit 1, it is a two-page document.

13    Could you tell me what it is, sir?

14        A     It appears to be a printout of

15    the computer base tracking system we had

16    at the office civil enforcement.

17        Q     You're using past tense.  Is it

18    currently used?

19        A     My knowledge of it is only from

20    the past.

21        Q     So is this the type of tracking

22    system that was used during your tenure at

23    the Civil Enforcement Unit?

24              MR. HAZAN:  Objection to form.

25        A     I'm not familiar with this
```

28

```
 1              ROUGH DRAFT
 2   format, but it appears to be a printout of
 3   the system that we used at the time I was
 4   there.
 5       Q      Have you ever seen that document
 6   before?
 7       A      I couldn't say for certain.
 8       Q      You are not sure whether you've
 9   seen it before?
10       A      No, I might have seen -- I've
11   seen something in this format, I can't say
12   for certain this was the document, that's
13   all.
14       Q      Just take a look at the document
15   for a minute.
16       A      Anything in particular I should
17   be looking for?
18       Q      The date of the seizure.
19       A      Okay.
20       Q      Does this tell you what date Mr.
21   Kapiti's vehicle was seized?
22              MR. HAZAN:  Objection to form.
23   You can answer.
24       A      It does not, as far as I can
25   tell.
```

```
 1            ROUGH DRAFT

 2      Q     Does it have his arrest date?

 3      A     It does.

 4      Q     Does it have a seizure number?

 5      A     It does.

 6      Q     Were you assigned to this case?

 7      A     It indicates I was assigned as

 8  the hearing attorney, which is a slight

 9  misnomer.  What it really means is, I was

10  assigned as the representative for the

11  police department if this case were to

12  have gone to an OATH hearing.

13      Q     Now, you are looking on the

14  left-hand side in the middle of the first

15  page, correct?

16      A     Correct.

17      Q     And next to the term hearing

18  attorney, ATTY, it has your last name,

19  correct?

20      A     It does.

21      Q     And that's the misnomer that you

22  indicated?

23      A     The word attorney is a misnomer

24  because at the time I was not an attorney,

25  I was simply a representative of the
```

```
 1              ROUGH DRAFT
 2    police department at these hearings.
 3       Q     Would it be more accurate to
 4    call you a hearing officer?
 5              MR. HAZAN:  Objection.
 6       A     It would be more accurate to not
 7    call me an attorney.
 8       Q     Now, underneath Hearing Attorney
 9    Triffon, it says hearing DISP, do you see
10    that?
11       A     Yes.
12       Q     What does that refer to, what
13    does that line refer to?
14              MR. HAZAN:  Objection to form.
15       A     Again, I'm simply interpreting
16    the page in front of me.  It appears to
17    say hearing disposition, which indicates
18    the disposition of the hearing.
19       Q     What does it say next to it?
20       A     Needed by DA as evidence dash
21    no.
22       Q     What does that mean?
23       A     To the best of my recollection,
24    it means that no hearing was going to be
25    conducted because the vehicle was needed
```

```
 1              ROUGH DRAFT
 2   as evidence by the district attorney.
 3       Q     Let's run through that one more
 4   time.  It says here needed by DA as
 5   evidence dash no, correct?
 6       A     Correct.  That's what I see.
 7       Q     And that, to you, means what?
 8             MR. HAZAN:  Objection.  Asked
 9       and answered.
10       Q     Is it needed by the DA as
11   evidence?
12       A     This to me indicates that it is
13   needed by the DA as evidence.
14       Q     That it is needed by the DA as
15   evidence?
16       A     Correct.
17       Q     And what on here indicates that
18   to you?
19       A     The phrase needed by DA as
20   evidence.
21       Q     And the phrase next to it, no?
22       A     Correct.  That indicates no
23   hearing would be conducted.
24       Q     Do you see on the right-hand
25   side hearing accepted, the middle of the
```

1               ROUGH DRAFT

2    page toward the center to the right?

3         A    Yes.

4         Q    Do you see the date underneath

5    that?

6         A    Yes.

7         Q    What does that represent to you?

8              MR. HAZAN:  Objection to form.

9    You can answer.

10        A    Simply that a hearing was

11   accepted and that the acceptance letter,

12   for lack of a better word, was received on

13   5-23-06.

14        Q    The column to the right, hearing

15   notice, what does that mean?

16        A    It indicates the date that the

17   notice of the hearing was sent.

18        Q    Are you sure of that?

19        A    No, I'm simply stating based on

20   what I'm looking at right now what it

21   seems to indicate.

22        Q    And so that I'm clear, this is

23   the first time you're seeing this

24   document, correct?

25             MR. HAZAN:  Objection.

```
 1              ROUGH DRAFT

 2      Q       To the best of your

 3   recollection?

 4              MR. HAZAN:  Objection.

 5      A       It looks familiar to me, but I

 6   can't say with certainty that I've looked

 7   at this exact document.

 8      Q       Have you seen documents similar

 9   to this one on other cases?

10      A       The format looks familiar to me,

11   but other than that -- let me rephrase.

12   As I stated in the beginning, this appears

13   to be the printout of a format that I'm

14   familiar with from a computer system that

15   we used at the office to track these

16   cases.

17      Q       If this represented your case,

18   would you have been the person who input

19   the information?

20              MR. HAZAN:  Objection.

21      A       No.  Not necessarily.

22      Q       Who would input the information

23   on a case of yours?

24              MR. HAZAN:  Objection to form.

25      A       I don't know.
```

```
 1              ROUGH DRAFT

 2    Q     So getting back to the hearing

 3   notice, if I recall correctly, your

 4   testimony is that is the date that

 5   represents the date that the hearing

 6   notice was sent out to the owner?

 7              MR. HAZAN:  Objection to form.

 8    A     I cannot testify with certainty

 9   that this indicates the date that anything

10   was sent out.  All I can say is that this

11   appears to be the date the hearing notice

12   would have been sent out based on the

13   document in front of me.

14    Q     Okay.  You see on the left-hand

15   side again, where it says classification,

16   do you see that line?

17    A     Yes.

18    Q     What does it say next to it?

19    A     Forfeiture.

20    Q     What does that mean?

21              MR. HAZAN:  Objection to form.

22    A     Define the term.

23    Q     No, you don't need to define the

24   term for me.  What does it mean that this

25   is classified as forfeiture?
```

```
 1              ROUGH DRAFT

 2              MR. HAZAN:  Objection to form.

 3      A     It's just an in-house -- in

 4   office classification of the cases we

 5   handled or we would get.

 6      Q     As opposed to what, what else

 7   could it be classified as?

 8      A     I don't recall.

 9      Q     Could it mean that the vehicle

10   is being held for forfeiture?

11              MR. HAZAN:  Objection.

12      A     I can't testify as to what it

13   could mean if I don't recall what it

14   means.

15      Q     On the top left fourth line from

16   the top, there is an asterisk and it says

17   the word "forfeiture" followed by the

18   number sign, do you see that?

19      A     I do.

20      Q     There is no number next to the

21   number sign; is that correct?

22      A     That's correct based on what I

23   have in front of me.

24      Q     Do you know why?

25      A     I do not.
```

```
 1              ROUGH DRAFT

 2      Q      If the car is being classified

 3   as a forfeiture, would there usually be a

 4   forfeiture number assigned to it?

 5              MR. HAZAN:  Objection.

 6      A      I don't know.

 7      Q      The following line down, next to

 8   the word "crime" it says "fireworks," do

 9   you know what that means?

10              MR. HAZAN:  Objection.

11      Q      What does the term refer to in

12   this case, why is the word fireworks

13   there?

14              MR. HAZAN:  Objection.

15      A      Again, I couldn't say.

16      Q      You have no independent

17   recollection of this case, correct?

18      A      Of this specific case, no.

19      Q      Do you know if there was a

20   criminal proceeding related to Mr. Kapiti

21   or his vehicle?

22      A      I don't have any independent

23   recollection of it.

24      Q      Have you ever met Mr. Kapiti?

25      A      Not that I can recall.
```

37

```
 1            ROUGH DRAFT

 2      Q     Did you ever speak to him?

 3      A     Not that I can recall.

 4      Q     Take a look if you will at the

 5  portion of the document starting with the

 6  word notes, do you see that?

 7      A     I do.

 8      Q     There are a few things that are

 9  redacted, other than that it appears to be

10  information that was typed in, correct?

11      A     It appears to be information

12  that was typed in, yes, correct.

13      Q     And it goes to the second page

14  of the document; is that right?

15      A     I'm sorry.

16      Q     It continues onto the second

17  page of the document?

18      A     It appears to, yes.

19      Q     If you would look at the entries

20  on Plaintiff's Exhibit 1, what is the

21  order?  Let me lead for a bit, is it fair

22  to say that the entries are in reverse

23  chronological order, meaning the entry to

24  the top right next to notes is the most

25  recent date and the entry at the bottom on
```

```
 1              ROUGH DRAFT

 2   page two is the oldest date?

 3              MR. HAZAN:  Objection to form.

 4      A      Based exclusively on the time

 5   and date stamps that appear at the

 6   beginning of each entry, I would say that

 7   is a correct statement.

 8      Q      So the first entry on this, on

 9   Plaintiff's Exhibit 1 would be the last

10   entry on page two?

11              MR. HAZAN:  Note my objection to

12      form.

13      Q      Is that correct?

14      A      I would agree with that

15   assessment.

16      Q      Okay.  Look at the earliest

17   entry which would be the full entry on

18   page two, if you would, did you input that

19   entry?

20      A      I have no independent

21   recollection of making this entry.

22      Q      Take a look at the last line

23   where it says Honda Finance will take

24   possession, Honda signed HH file to basket

25   for approval, GT.  Is GT you?
```

39

1              ROUGH DRAFT

2      A     GT are my initials.

3      Q     Would that mean that you put

4    this information into the computer?

5      A      It is an indication that I made

6    that entry.

7      Q      You have no independent

8    recollection of it though?

9      A      I have no independent

10   recollection and it is not certain, but it

11   is an indication that I made that entry.

12     Q      Do you have any recollection of

13   why you would have put this information

14   into the computer?

15     A      None whatsoever.

16     Q      And the date that this was

17   entered was what?

18     A      Reading from the page it says

19   06-02-2006.

20     Q      Other than the date and the time

21   stamp on this document, is it fair to say

22   you have no independent recollection of

23   this?

24     A      Including the time and date, I

25   have no independent recollection of this.

40

```
 1              ROUGH DRAFT

 2      Q      Correct?

 3      A      Right.

 4      Q      Do you have any recollection of

 5  speaking with Honda?

 6      A      I do not.

 7      Q      Or anybody at Honda?

 8      A      I do not.

 9      Q      Let me show you what has been

10  marked Plaintiffs' Exhibit 10, tell me if

11  you recognize it?

12      A      I don't recognize this specific

13  document, but again, the format looks

14  familiar to me.

15      Q      Have you ever seen that document

16  before, to the best of your recollection?

17      A      I don't remember.

18      Q      Let me show you what has been

19  marked Plaintiff's Exhibit 11.  The same

20  question, have you ever seen that before?

21      A      I have not.

22      Q      Do you have any recollection of

23  seeing that document?

24      A      No recollection whatsoever.

25      Q      Okay.  On Plaintiff's
```

```
 1              ROUGH DRAFT
 2    Exhibit 11, do you have any recollection
 3    of the substance of that letter?
 4              MR. HAZAN:  Objection to form.
 5      A    No.
 6      Q    Let's go back to Plaintiff's 1.
 7    Can you tell me, Sergeant Triffon, if the
 8    hearing for Mr. Kapiti ever took place?
 9              MR. HAZAN:  Objection to form.
10      Q    The Krimstock hearing?
11      A    I have no independent
12    recollection of whether or not it took
13    place.
14      Q    Does this document help you?
15              MR. HAZAN:  Objection to form.
16      A    The document doesn't help my
17    independent recollection.
18      Q    Does it indicate if a hearing
19    was held?
20      A    I don't see any indication on
21    here as to whether or not a hearing was
22    held.
23      Q    Does it indicate whether a
24    hearing was not held?
25      A    That's really the same question.
```

42

1          ROUGH DRAFT

2      Q     Only in reverse, but I'm just

3   making sure that it doesn't say anything

4   about whether a hearing was held or not,

5   correct?

6          MR. HAZAN:  Objection to form.

7      A     The hearing disposition line we

8   referred to before gives some indication

9   that no hearing was held.

10     Q     That's the word no at the end of

11  that line?

12     A     Correct.

13     Q     Does it indicate why a hearing

14  was not held?

15     A     Reading from the page, it states

16  needed by DA as evidence.

17     Q     Is that why a hearing was not

18  held?

19     A     I can't say for sure.

20     Q     On the bottom of page one

21  continuing onto page two, there's an entry

22  dated 6-5-06, do you see that?

23     A     I do.

24     Q     The June 5th date is the same

25  date as is listed under hearing notice, do

```
 1              ROUGH DRAFT
 2  you see that?
 3      A     I do.
 4      Q     Why is that, if you know?
 5      A     I don't know.
 6      Q     Now, the document that I showed
 7  you that was People's 10, you said you've
 8  seen documents like this before?
 9      A     The format is familiar to me.
10      Q     What is it, what type of
11  document is it?
12              MR. HAZAN:  Objection to form.
13      Q     And so the record is clear, this
14  is Bates stamped NYC 127.  It's a document
15  produced by the City during discovery.
16      A     It appears to be an agreement
17  similar to those generated by civil
18  enforcement.
19      Q     Is there a term for this
20  agreement?
21      A     It appears to be a hold harmless
22  agreement.
23      Q     And it is a hold harmless
24  agreement between who and who?
25              MR. HAZAN:  Objection to form.
```

44

```
 1           ROUGH DRAFT

 2     A     I can't say other than to read

 3   from the page it appears to have Honda

 4   Financial indicated on there.

 5     Q     And the other party would be the

 6   New York City Police Department?

 7           MR. HAZAN:  Objection to form.

 8     A     Again, just based on what I see

 9   in front of me, I see property clerk New

10   York City Police Department indicated as

11   one of the parties.

12     Q     What is the date on that hold

13   harmless agreement?

14           MR. HAZAN:  Objection to form.

15     A     I don't know independently and I

16   cannot quite read it from the copy given

17   to me.

18     Q     Can you tell me a month?

19           MR. HAZAN:  Objection to form.

20           And we could all read this document he

21           didn't create this document.  I don't

22           see the purpose of this, but go ahead.

23     A     I see the word May.

24     Q     Do you see the year?

25     A     It is illegible.
```

45

```
 1            ROUGH DRAFT
 2      Q      Is that better?
 3            MR. HAZAN:  For the record,
 4      counsel for plaintiff is showing the
 5      witness another document also Bates
 6      stamped NYC 127.
 7      A      Again, it is illegible.  I can
 8  try to interpret it, but I can't say for
 9  certain what that date says.
10      Q      Can you tell us if this document
11  turned over by the City as NYC 127,
12  relates to the Kapiti case, to your
13  knowledge?
14            MR. HAZAN:  Objection.
15      A      I don't know.
16      Q      For a moment looking again at
17  Plaintiff's 10, assume for a moment for my
18  question, that the date of the hold
19  harmless agreement was sworn to on the
20  30th day of May 2006.  Typically after a
21  hold harmless agreement is entered into
22  with a party or whomever it's entered into
23  with, what is the next step that you,
24  representing the NYPD, would do?
25            MR. HAZAN:  Objection.
```

46

```
 1            ROUGH DRAFT
 2      A    I would need you to rephrase
 3   that.  You want me to testify as to facts
 4   based on a hypothetical.
 5      Q    Let me rephrase.  You receive a
 6   hold harmless agreement from Honda
 7   financial, what is your next move, what is
 8   it that you do next as representing the
 9   City in the negotiations?
10           MR. HAZAN:  Objection to form.
11      A    I really couldn't say, there's
12   no general next move, it would depend on
13   the case.  I really couldn't --
14      Q    Why would you seek a hold
15   harmless agreement from a car could?
16           MR. HAZAN:  Objection.
17      A    All I can testify to is my own
18   memory and I would seek it because --
19   honestly I really couldn't say why I would
20   seek it, it's part of a settlement
21   agreement with the titled owner of the
22   vehicle.
23      Q    So if the titled owner of the
24   vehicle signed a hold harmless agreement,
25   is it your testimony that you would then
```

```
 1              ROUGH DRAFT
 2   return the vehicle to the titled owner?
 3              MR. HAZAN:  Objection to form.
 4     A     No, that's not exactly what I'm
 5   saying, honestly I couldn't say exactly
 6   why the hold harmless would be given nor
 7   with any certainty exactly what would
 8   happen based on the hold harmless being
 9   signed.
10     Q     Really?
11     A     Correct.
12     Q     So why would you have a hold
13   harmless agreement with a car company if
14   it didn't result in the return of the
15   vehicle to that car company?
16              MR. HAZAN:  Objection to form.
17        Again, the witness is here to testify
18        about what he did, not general
19        policies.
20              MR. KESSLER:  I'm asking what he
21        did.
22              MR. HAZAN:  What he did in this
23        case?
24              MR. KESSLER:  I'm asking what he
25        did, sure.
```

48

```
 1              ROUGH DRAFT
 2     A    You're actually asking why I did
 3  it and I really couldn't say, I didn't
 4  draft the agreement.
 5     Q    Well, is it fair to say it is a
 6  form agreement most have the document is
 7  typed in already?
 8          MR. HAZAN:  Objection.
 9     A    Well, I mean that would be true
10  of just about everything.
11     Q    Is it true about this?
12          MR. HAZAN:  Objection to form.
13     He didn't draft this he testified.
14          MR. KESSLER:  I'm not asking if
15     he drafted it, is this a form
16     document?
17          MR. HAZAN:  Objection.
18     A    Again, I mean, I understand what
19  you're getting at, but you are going to
20  have to be more clear for me.  I did not
21  draft this document.
22     Q    I'm sure you didn't.  Somewhere
23  in the Civil Enforcement Unit on 2
24  Lafayette Street, there is a stack of
25  papers which without the filled in words
```

1          ROUGH DRAFT

2    looks a lot like this; is that correct?

3          MR. HAZAN:  Objection to form.

4    A    So your question specifically is

5    somewhere in CEU there is a stack of

6    papers that looks like this, but not

7    filled in, and my answer to that is I

8    could not say, I do not know.

9    Q    Is this generated by a computer?

10         MR. HAZAN:  Objection to form.

11   Q    Or is it a preprinted form?

12         MR. HAZAN:  Objection to form.

13   Again, he didn't fill this out.

14   Q    With the exception of the

15   handwritten material?

16         MR. HAZAN:  Objection to form.

17   Again, he didn't fill this out.  There

18   is no foundation laid that he would

19   know any of this information and he's

20   here to be a fact witness about what

21   he did in this case.

22         MR. KESSLER:  Are you done?

23         MR. HAZAN:  I'm done.

24         MR. KESSLER:  Thank you.

25   A    So give me your question again.

50

1          ROUGH DRAFT

2     Q     Have you ever seen a hold

3  harmless agreement before?

4     A     I have.

5     Q     Does it look something like what

6  is in front of you as Plaintiff's 10?

7          MR. HAZAN:  Objection to form.

8     A     The document in front of me

9  appears to be a hold harmless form which I

10  have seen before, not this specific

11  document but the form itself.

12     Q     Now, when you say not this

13  specific document, but the form, what do

14  you mean?

15     A     The format of the document in

16  front of me.

17     Q     Is familiar to you?

18     A     Including the type set and

19  physical characteristics of the letter.

20     Q     How is it familiar to you?

21          MR. HAZAN:  Objection.

22     Q     Why is it familiar to you?

23     A     Because I've seen them before.

24     Q     Where?

25     A     While working at the Civil

```
 1              ROUGH DRAFT
 2   Enforcement Unit.
 3       Q      Did you ever use one before?
 4           MR. HAZAN:  Objection.
 5       A      Explain "use".
 6       Q      Did you have a document like
 7   this in any of your cases?
 8           MR. HAZAN:  Objection.  Are we
 9       talking about the exact document with
10       the same words or are we talking about
11       a document like this?
12           MR. KESSLER:  We're talking
13       about what the question was.
14       A      The appearance of this document
15   looks familiar to me, including or rather
16   as something I have seen in the course of
17   my work at the Civil Enforcement Unit.
18       Q      I understand that you've
19   testified that you don't believe you've
20   seen this particular document before was
21   that your testimony?
22       A      That's correct.
23       Q      But I'm talking now the generic
24   document that you referred to as a hold
25   harmless agreement, have you seen that
```

52

```
 1            ROUGH DRAFT

 2   before?

 3            MR. HAZAN:  Objection.

 4       Q    And you testified yes correct?

 5       A    I mean I apologize for being

 6   repetitive the only thing I can say for

 7   certain this appears to be a hold harmless

 8   which is something I have seen before.

 9       Q    Did you ever use a hold harmless

10   agreement in any of your cases while at

11   CEU?

12            MR. HAZAN:  Objection to form.

13       A    Again, I'm not comfortable with

14   the word use, I don't know specifically

15   what you mean.

16       Q    Did the resolution of any of

17   your cases involve the use of a hold

18   harmless agreement?

19       A    To my memory, the resolution of

20   cases that I had been involved with

21   included a hold harmless agreement.

22       Q    Under what circumstances would

23   you use a hold harmless agreement?

24            MR. HAZAN:  Objection.

25       A    I'm sorry, you'll have to be
```

```
 1              ROUGH DRAFT

 2   more specific.

 3       Q     I can't be, this is your

 4   question, when would you use a hold

 5   harmless agreement in one of your cases?

 6              MR. HAZAN:  Objection.

 7       A     I can't say specifically, it

 8   would depend on the case.

 9       Q     Such as what, what would it

10   depend on?

11              MR. HAZAN:  Objection.

12       A     To the best of my memory, when a

13   vehicle is returned to the titled owner.

14       Q     When the vehicle was returned to

15   the titled owner, there would be a hold

16   harmless agreement signed by the titled

17   owner, is that your testimony?

18       A     To the best of my memory, yes.

19       Q     You've several times used the

20   term titled owner, as opposed to what

21   other type of owner would that be?

22              MR. HAZAN:  Objection.

23       A     The phrase titled owner as I use

24   it, refers to the person or entity named

25   on the certificate of title.
```

54

1              ROUGH DRAFT

2      Q      Does it refer to the person or

3   entity named on the registration?

4      A      No.

5      Q      If the titled owner and the

6   registered owner were different, what

7   would you do as the person representing

8   the Civil Enforcement Unit?

9              MR. HAZAN:  Objection to form.

10     A      It's just that's to vague, I

11   don't understand what you mean what I

12   would do.

13     Q      A notice would be sent out for a

14   Krimstock hearing, correct?

15             MR. HAZAN:  Objection.

16     A      It depends on the circumstances.

17     Q      Under what circumstances would a

18   notice for a Krimstock hearing not be sent

19   out?

20             MR. HAZAN:  Objection.

21     A      Because I have no independent

22   recollection of this case, I can't answer

23   a question like that, without a detailed

24   and specific list of circumstances leading

25   up to it.

55

1          ROUGH DRAFT

2     Q     Was Mr. Kapiti the titled owner

3  of this vehicle?

4     A     I don't know.

5     Q     Does Plaintiff's 1 refresh your

6  recollection?

7     A     Plaintiff's 1 does not refresh

8  my own recollection, there is a caption on

9  Plaintiff's 1 that indicates titled owner

10  HVT Incorporated.

11     Q     Do you know what HVT

12  Incorporated is?

13     A     I do not.

14     Q     But Plaintiff's 1 does indicate

15  that Mr. Kapiti was notified for a

16  Krimstock hearing, correct?

17          MR. HAZAN:  Objection.

18     A     On Plaintiff's 1 there is an

19  indication that Mark Kapiti was given

20  notice of a hearing.

21     Q     Yet he is not the title owner

22  according to that document, correct?

23     A     Right.  There is an indication

24  on this form that the titled owner is not

25  Mark Kapiti.

56

1           ROUGH DRAFT

2      Q      So, why if you know, was Mr.

3  Kapiti given notice of a hearing if he was

4  not the titled owner to the vehicle?

5           MR. HAZAN:  Objection to form.

6      A      Repeat the question.  I'm sorry.

7      Q      Why was Mr. Kapiti given notice

8  of a Krimstock hearing if he was not the

9  titled owner to the vehicle?

10     A      I don't know, or rather, don't

11  recall.

12     Q      Are you familiar with the second

13  circuit decision in Krimstock versus

14  Kelly?

15           MR. HAZAN:  Objection.

16     A      No.  Familiar to what extent?

17     Q      I'm not testing you on it.  I'm

18  just asking you if it was a case that you

19  knew about or discussed with your

20  supervisors when you were at civil

21  enforcement?

22           MR. HAZAN:  Objection.

23     A      I have no specific recollection

24  of discussing it with anyone.  The name of

25  the case you stated does sound familiar to

```
 1              ROUGH DRAFT
 2   me in regards to the forfeiture.
 3        Q     Do you know what the decision
 4   stands for?
 5              MR. HAZAN:  Objection.
 6        A     I do not.
 7        Q     Going back to Plaintiff's 1,
 8   that entry on June 5th, it says awaiting
 9   DAR, what is that?
10        A     To the best of my memory, that
11   is a district attorney's release.
12        Q     And then after that it says,
13   "ADA Rita Benevich wants car for evidence,
14   will call when released."  There is a
15   telephone number and then file on GT desk.
16   GT.  Is that you, GT?
17        A     I can't say for certain that I
18   made that entry, but it is an indication
19   that I made that entry.
20        Q     And would that entry indicate
21   that the file remained on your desk?
22              MR. HAZAN:  Objection to form.
23        A     The entry indicates that at the
24   time the entry was made the file was on
25   GT's desk.
```

1            ROUGH DRAFT

2        Q      The next entry that would be on

3    page one of Plaintiff's 1, do you see the

4    date on that?

5        A      You are referring to the entry

6    immediately above the June 5th entry?

7        Q      Yes.

8        A      The date reads 7-10-2006.

9        Q      And that entry says awaiting.

10   DAR what does that mean?

11       A      It seems to indicate awaiting

12   the district attorney's release.

13       Q      And at the end of that it says,

14   "File to cabinet.  GT."  Those are your

15   initials again, although you don't have

16   specific recollection of that, correct?

17       A      Correct.

18       Q      Okay.  I want to show you what

19   has been marked Plaintiff's 5, have you

20   ever seen it before?

21       A      I can't say for certain if I

22   have ever seen this particular document,

23   but the format is familiar to me.

24       Q      What is it familiar as?

25       A      Part of a set of interoffice

```
 1              ROUGH DRAFT

 2   memos inside the police department.   In

 3   trial office I should say.

 4       Q      What's the date on this

 5   document?

 6       A      Reading from the document, June

 7   2nd, 2006.

 8       Q      And this is document Bates

 9   stamped NYC 15 and turned over as part of

10   the discovery by the City.   Whose

11   signature is in the middle of the page

12   there, if you know?

13              MR. HAZAN:   Objection to form.

14       A      I don't know.

15       Q      You've never seen that signature

16   before?

17              MR. HAZAN:   Objection.

18       A      I don't remember, it doesn't

19   look familiar to me.   I do not know.

20       Q      Is there a date next to the

21   signature right underneath the signature

22   line?

23              MR. HAZAN:   Objection.

24       A      I see the digit, 6-2-06.

25       Q      That correlates to the June 2,
```

```
 1              ROUGH DRAFT
 2    2006, at the top of the page, correct?
 3              MR. HAZAN:  Objection.
 4         A     Yes.
 5         Q     And below the signature it says
 6    the name of Robert F. Messner, correct?
 7         A     Yes.
 8         Q     And he would be the man in
 9    charge at the Civil Enforcement Unit?
10         A     He's the commanding officer of
11    the Civil Enforcement Unit.
12         Q     On the bottom of the page, the
13    left-hand side, do you see where it says
14    DAs release received verbal written?
15         A     Yes.
16         Q     Do you see the box to the left
17    of that?
18         A     I do.
19         Q     Do you see that it's checked?
20         A     I do.
21         Q     And do you see the word written
22    to the right is circled, correct?
23         A     I agree.
24         Q     What does that mean?
25              MR. HAZAN:  Objection.
```

```
 1              ROUGH DRAFT

 2      A    What does it mean?

 3      Q    Yes.

 4      A    I mean, I can just read from it

 5  the same as you can.  It says district

 6  attorneys release received and the word

 7  written is circled.

 8      Q    So a written release was

 9  received and that box was checked off?

10           MR. HAZAN:  Objection.

11      A    It would seem to indicate that,

12  I can't say for certain that it was

13  actually received.

14      Q    Do you know whose signature is

15  at the bottom right of the document?

16      A    I don't.

17           MR. KESSLER:  Off the record.

18           (Discussion off the record.)

19      Q    Back on the record.

20           Let me show you what has been

21  marked as Plaintiffs' Exhibit 2.

22      A    Okay.  The document is Bates

23  stamped NYC 16 handed over as part of

24  discovery by the City, have you ever seen

25  this before.
```

```
 1            ROUGH DRAFT

 2     A      Not that I recall.

 3     Q      Have you ever seen something

 4  like it before?

 5            MR. HAZAN:  Objection.

 6     A      This does not look familiar to

 7  me, no.

 8     Q      Okay on the top right it has the

 9  name Eva Marie Russo, is that the young

10  lady you referred to earlier?

11            MR. HAZAN:  Objection.

12     A      Which lady specifically?

13     Q      When we were talking about your

14  supervisors at the CEU?

15     A      Eva Marie Russo was my

16  supervisor.

17     Q      She was your immediate

18  supervisor?

19     A      Correct.

20     Q      And there is a CC to the left

21  MCCARTHC@BronxDA.NYC.GOV, do you see that?

22     A      I do.

23     Q      Do you know what that is, who

24  that refers to?

25     A      I do not.
```

```
 1              ROUGH DRAFT

 2      Q     The substance of this document

 3  says pursuant to the second amended order

 4  and judgment in the matter of Krimstock

 5  versus Kelly, do you see that?

 6      A     I do.

 7      Q     What is your understanding of

 8  what the second amended order and judgment

 9  in the matter of Krimstock versus Kelly

10  was?

11              MR. HAZAN:  Objection.

12      A     I definitely don't recall.

13      Q     Does the substance of this

14  document refresh your recollection as to

15  what that would be?

16              MR. HAZAN:  Objection.

17      A     No -- does the substance of this

18  document refresh my memory as to what the

19  second amended order and judgment in the

20  matter of Krimstock v. Kelly means, my

21  answer is no.

22      Q     The substance of this document

23  requests the DA's office to respond no

24  later than three business days before the

25  hearing date whether or not the vehicle is
```

```
 1              ROUGH DRAFT

 2   needed as evidence in the criminal

 3   proceeding.  Do you see that substance of

 4   the e-mail?

 5              MR. HAZAN:  Objection.

 6        A    I do.

 7        Q    And toward the bottom of the

 8   e-mail, you see the number two, it says

 9   defendant Mark Kapiti?  It's in the middle

10   of the page.

11        A    Yes, I do see that.

12        Q    And underneath the word vehicle

13   it says OATH hearing dash June 5, 2006,

14   correct?

15        A    Yes.

16        Q    Going back for a minute to

17   Plaintiff's 1, in the column that says

18   hearing notice, does that refresh your

19   recollection as to what that date means?

20              MR. HAZAN:  Objection.

21        A    It does not refresh my

22   recollection as to what it means.

23        Q    But at least according to this

24   e-mail the OATH hearing was scheduled for

25   June 5th, correct?
```

65

```
 1                ROUGH DRAFT

 2                MR. HAZAN:  Objection.

 3      A       Plaintiffs' Exhibit 2, which I

 4   have in front of me?

 5      Q       Yes.

 6      A       Seems to indicate that an OATH

 7   hearing date was scheduled for June 5,

 8   2006.

 9      Q       For Mr. Kapiti?

10      A       Right this is not based on my

11   memory, this is simply what I'm reading in

12   front of me and what it seems to indicate.

13      Q       Assuming that is accurate for a

14   moment and assuming that June 5th, 2006,

15   was a Monday, which we can spend a lot of

16   time litigating that if the City need be,

17   but let's take that as an assumption for

18   the moment, three business days before

19   June 5th, 2006, would have been when?

20                MR. HAZAN:  Objection.

21      Q       If the 5th were a Monday?

22                MR. HAZAN:  Objection.

23      Q       What is your objection?

24                MR. HAZAN:  This is a line of

25      questioning that -- you are asking him
```

66

```
 1              ROUGH DRAFT
 2       a hypothetical.
 3              MR. KESSLER:  I'm not asking him
 4       a hypothetical.
 5              MR. HAZAN:  We don't know if
 6       there were any holidays, we don't know
 7       if it was a Monday, and it's something
 8       you could figure out as part of the
 9       record, there's no reason this witness
10       needs to answer how many business days
11       it was before June 5th.  It's
12       something you can calculate and argue
13       in whatever papers you need to submit
14       to the court.  But he can answer if he
15       can, I'm just objecting.
16       A     So the question is?
17       Q     May 31st is three business days
18  prior to June 5th, 2006, did your office
19  receive a district attorney's release on
20  or before May 31, 2006, regarding Mr.
21  Kapiti's car?
22              MR. HAZAN:  Objection.
23       A     I definitely have no independent
24  recollection of that.  If you want to
25  point to something --
```

1         ROUGH DRAFT

2    Q    Based upon Plaintiff's

3  Exhibit 1, and the entries there?

4        MR. HAZAN:  Objection.

5    A    So the question is?

6    Q    On May 31, 2006, did your office

7  have a district attorney's release

8  regarding Mr. Kapiti?

9        MR. HAZAN:  Objection.

10    A    There's no way for me to tell

11  from Exhibit 1 whether or not the office

12  had received a district attorney's

13  release.

14    Q    The entry on 6-5-06 which says

15  awaiting DAR, the entry on 7-10-06 which

16  says awaiting DAR?

17    A    Again to clarify, the entries

18  here indicate that no district attorney's

19  release had been received on those dates,

20  but there's no way I can testify with any

21  certainty that it was or was not.

22    Q    Is there any reason for you to

23  believe that the document produced by the

24  City that's been marked as Plaintiff's

25  Exhibit 1 is incorrect or fraudulent?

68

```
 1              ROUGH DRAFT

 2      A      Not fraudulent.  Certainly, but

 3   certainly susceptible to human error,

 4   Plaintiff's 1s a printout of a computer,

 5   in-house computer tracking system used for

 6   informational purposes within the office

 7   only.  Which is the reason I can't say for

 8   certain that the GT entries were made by

 9   me, nor testify to the voracity of the

10   entries that are made.

11      Q      So you cannot testify to the

12   voracity of the entries that are made?

13      A      Correct.

14      Q      Are you aware of what the

15   procedures required under the second

16   amended order and judgment of Krimstock

17   are?

18              MR. HAZAN:  Objection.

19      A      I definitely do not have

20   sufficient independent recollection to

21   explain the second amended order and

22   judgment.

23      Q      Mr. Kapiti has already testified

24   that he was called and told that his

25   Krimstock hearing was cancelled.  Were you
```

```
 1              ROUGH DRAFT
 2  the person who called him?
 3              MR. HAZAN:  Objection.
 4       A     I don't remember.
 5       Q     So that's neither a yes or a no,
 6  you just don't remember?
 7       A     Correct.
 8       Q     Why is there no entry on
 9  Plaintiff's Exhibit 1 indicating that the
10  Krimstock hearing was cancelled?
11              MR. HAZAN:  Objection.
12       A     Well, firstly I cannot say for
13  certain that there is no indication on
14  here where it was cancelled.
15       Q     Show me an indication where it
16  was cancelled.
17              MR. HAZAN:  Objection.
18       A     My answer is simply that I
19  cannot state with certainty that this
20  document does not indicate that it was
21  cancelled.  Similarly I can't pick out the
22  spot where it says that it is either.  If
23  you care to point out something on here, I
24  would be happy to try --
25       Q     There is nothing on here that I
```

```
 1              ROUGH DRAFT
 2   see, but there may be that you know.  But
 3   there's no indication that any hearing was
 4   conducted or cancelled for that matter?
 5       A      Do we have a question for me to
 6   answer?
 7       Q      No, I'm just answering yours.
 8   When you have an OATH hearing, what are
 9   the procedures of the OATH hearing?
10              MR. HAZAN:  Objection.
11       Q      That you've conducted?
12              MR. HAZAN:  Objection.
13       Q      What happens at an OATH hearing?
14              MR. HAZAN:  Objection.
15       A      I mean, specifically what would
16   you like to know?
17       Q      Do you testify, does the owner
18   testify, what happens?
19              MR. HAZAN:  Objection.
20       A      To the best of my memory, there
21   is an appearance made by a representative
22   of the police department and an appearance
23   made by whoever was noticed for the
24   hearing.
25       Q      Both of you appear before a
```

1               ROUGH DRAFT

2    judge?

3               MR. HAZAN:  Objection.

4        A      Administrative judge.

5        Q      Is there testimony taken?

6               MR. HAZAN:  Objection.

7        A      Explain "testimony" to me.

8        Q      You tell me, you conducted the

9    hearings, I want to know what happens when

10   you conduct an OATH hearing.

11       A      The OATH hearing determines who

12   will hold onto a vehicle pending the

13   outcome of any pending any civil

14   forfeiture actions.

15       Q      That's correct?

16       A      That is determined by the

17   administrative judge at OATH, that is

18   pretty much the extent of my recollection

19   of it.

20       Q      Does a police officer testify at

21   the OATH hearing?

22               MR. HAZAN:  Objection.

23       A      Again, it depends on the

24   hearing.  Never in my experience or

25   recollection did a police officer testify

```
 1              ROUGH DRAFT
 2   at the hearing.
 3       Q     Okay.  That's the answer that
 4   I'm looking for.
 5       A     Okay.
 6       Q     Does the noticed party, the
 7   owner, testify as the hearing?
 8             MR. HAZAN:  Objection.
 9       A     Again, they are entitled to, but
10   I don't have any independent recollection
11   of any specific hearing that, you know,
12   that you might be referring to, they are
13   entitled to.
14       Q     They are entitled to?
15       A     Right.
16       Q     And in your experience having
17   handled OATH hearings, have you had
18   hearings where the owner has testified?
19       A     In my experience with OATH
20   hearings has the owner ever testified,
21   that's your question?
22       Q     Yes.
23       A     To the best of my memory, yes
24   owners have testified.
25       Q     You said that the issue is the
```

```
 1              ROUGH DRAFT

 2   retention of the vehicle pending the

 3   forfeiture case, correct?

 4       A     That's my understanding.

 5       Q     Regarding Mr. Kapiti and his

 6   vehicle, is there anything in any of the

 7   documents that I've shown you today or

 8   based on your recollection that indicates

 9   that a civil forfeiture action was

10   commenced against him or his vehicle?

11              MR. HAZAN:  Objection to form.

12       A     I have no independent

13   recollection of one.

14       Q     Is there anything on the CEU

15   voucher tracking system that indicates

16   that a forfeiture action was commenced

17   against the vehicle?

18              MR. HAZAN:  Objection.

19       A     I can't tell, I don't know.

20       Q     Do you recall any discussions

21   you may have had with Honda regarding the

22   vehicle in question here?

23       A     I don't recall.

24       Q     Was there a procedure while you

25   were at CEU, was there a procedure in
```

```
 1              ROUGH DRAFT
 2    place relating to leased vehicles?
 3              MR. HAZAN:  Objection.
 4        A     Nothing specific that I can
 5    think of, no.
 6        Q     Were leased vehicles treated any
 7    differently than non-leased vehicle?
 8              MR. HAZAN:  Objection.  Again,
 9         the witness is here to talk about the
10         facts of this case.
11        Q     You can answer.
12        A     Every case was treated
13    individually, I cannot say for certain
14    whether leased vehicles were or were
15    not -- whether leased vehicles were
16    treated any differently than any other.
17        Q     On Plaintiff's 1, there is a
18    line on the left-hand side for litigation
19    attorney, do you see that?
20        A     I do.
21        Q     It's blank, correct?
22        A     On the copy in front of me, it
23    is.
24        Q     Do you know why?
25        A     I don't.
```

1          ROUGH DRAFT

2          MR. KESSLER:  Off the record.

3          (Discussion off the record.)

4     Q     Back on the record.  Let's go

5     back to Plaintiffs' Exhibit 3.  Did you

6     prepare this letter, this memo?

7     A     I don't have any independent

8     recollection of having prepared it.  My

9     signature is at the bottom of the letter

10    indicating that I did.

11    Q     Is there any reason for you to

12    believe that you did not prepare this

13    letter as you see it here today?

14    A     You'd have to clarify the word

15    "prepare."  This is a form letter used

16    within the police department.  So likely I

17    did not draft it, but by having signed it,

18    I likely read it.

19    Q     Explain that likely you did not

20    draft it?

21    A     This letter is part of a

22    package, I believe, of three letters that

23    stay within the office generally as just

24    updates for the status of a case.  The

25    language on each of them is typically

```
 1              ROUGH DRAFT
 2    exactly the same with changes only in the
 3    date and the people involved.
 4         Q     And the car?
 5         A     And the vehicle.  Dates, storage
 6    numbers et cetera, so for sake of
 7    clarification of my answer, it appears as
 8    though I signed this letter, but the word
 9    prepare again it's unlikely that I
10    actually drafted the letter in its
11    entirety.
12         Q     Would you have filled in those
13    blanks that you indicated just a moment
14    ago?
15              MR. HAZAN:  Objection.
16         Q     Would you have filled in seizure
17    number, storage number, the date, the type
18    of car things like that?
19         A     Possibly.
20         Q     Who is it sent to, you said it
21    is part of a package, who is the assistant
22    commissioner, Civil Enforcement Unit?
23              MR. HAZAN:  Objection.  Is the
24         question who is that or is it who was
25         it sent to?
```

1            ROUGH DRAFT

2    Q      This document is addressed to

3    whom, Sergeant?

4    A      Based on the document in front

5    of me, it appears to be addressed to the

6    assistant commissioner of the Civil

7    Enforcement Unit, which to the best of my

8    recollection on the date -- at the time

9    the letter was dated was Robert Messner.

10   Q      I'm going to show you what has

11   been marked Plaintiff's 4.  Do you know

12   what that is?

13   A      It appears to be the second of

14   three in-house letters that circulate the

15   Civil Enforcement Unit for informational

16   purposes.

17   Q      And if you could, just for a

18   moment, go back to Plaintiff's 3, what was

19   the date on that?

20   A      Plaintiff's 3 is dated June 2nd,

21   2006.

22   Q      What about Plaintiff's 4?

23   A      Plaintiff's 4 is dated June 2nd,

24   2006.

25   Q      And from whom and to whom is

1                    ROUGH DRAFT

2    this memo?

3              MR. HAZAN:  Objection.

4        Q      It's written by whom?

5              MR. HAZAN:  Objection.

6        A      Based strictly on the letter in

7    front of me, the line from says assistant

8    commissioner Civil Enforcement Unit.

9        Q      And that was Mr. Messner at the

10   time?

11       A      To the best of my knowledge on

12   June 2, 2006, that was Robert Messner and

13   it's addressed to the commanding officer

14   of the property clerk division.

15       Q      Who is that?

16       A      That I don't know, or that I

17   don't recall rather.

18       Q      Is this one of the other parts

19   of the packet that you referred to moments

20   ago?

21       A      Correct.

22       Q      Of the three letters?

23       A      Correct.

24       Q      So Plaintiff's 3 is one,

25   Plaintiff's 4 is another?

79

```
 1              ROUGH DRAFT
 2       A      Correct.
 3       Q      And would Plaintiff's 5 been the
 4  third which I believe I've shown you
 5  before?
 6       A      To my memory, this would
 7  represent the third of the package that is
 8  usually prepared together.
 9       Q      And it appears that all three
10  are dated the same date, correct?
11       A      Correct.
12       Q      Plaintiff's 4 indicates in bold
13  letters in the top there, the case has
14  been settled, please release the vehicle
15  to the properly identified bearer of
16  release showing valid ownership of the
17  vehicle, correct?
18       A      That's what it says, yes.
19       Q      Yet on the top right next to the
20  word settle it has the word "none," do you
21  see that?
22       A      I do see that.
23       Q      What does that mean?
24              MR. HAZAN:  Objection.
25       Q      If you know.
```

1          ROUGH DRAFT

2     A     I do not know or rather I don't

3   recall.

4     Q     But based upon these three

5   documents as a whole I guess, as of

6   June 2, 2006, the Civil Enforcement Unit

7   had released the vehicle to the properly

8   identified bearer of release showing valid

9   ownership of the vehicle correct answering

10   his questions for him?

11          MR. HAZAN:  What?

12          MR. KESSLER:  Are you answering

13     his questions for him?

14          MR. HAZAN:  I certainly am not.

15     Q     Okay.

16     A     If the question is does this

17   indicate that June 2, 2006, the vehicle

18   was released --

19     Q     No.

20     A     Okay.

21     Q     The question is as of June 2,

22   2006, The Civil Enforcement Unit had

23   released the vehicle and closed its case

24   regarding property clerk versus Mark

25   Kapiti?

1              ROUGH DRAFT

2              MR. HAZAN:  Objection.

3        Q     The vehicle involving Mr.

4   Kapiti, correct?

5              MR. HAZAN:  Objection.

6        A     No.

7        Q     No?

8        A     The documents you are referring

9   to and I have just looked over appear to

10  indicate an intent to release the vehicle.

11       Q     So if I had -- if I was in

12  possession of let's say all three of these

13  documents and I went to the pound where

14  the car was held and I presented it with

15  proper identification as the owner, would

16  I get the vehicle back?

17             MR. HAZAN:  Objection.

18       A     First of all, I'm not

19  comfortable answering it as a

20  hypothetical.  And even as a hypothetical

21  it's flawed in that, other than the third

22  marked Plaintiffs' Exhibit 5.

23       Q     Yes?

24       A     These documents stay within the

25  police department so --

ROUGH DRAFT

Q So let's use Plaintiff's 5.

A Okay.

Q I take that to the pound, show a proper ID, do I get the car back?

MR. HAZAN: Objection.

A All other things -- I can't say with certainty you would get the car back, but the indication here is that the legal bureau has authorized the release of the vehicle. So I mean, you're stating simply showing up with this one piece of paper you are asking if that is enough to have the car released, my answer would be no.

Q My question is Plaintiff's 5, this letter, it says notice to vehicle claimant's. Do you see the bottom portion?

A Yes.

Q This letter gives the titled owner authorization to claim the above vehicle from the college point pound, then next line, in capital letters, claim it immediately. Do you see that?

A I do.

83

```
 1              ROUGH DRAFT

 2      Q      Okay.  So let me rephrase my

 3   question.  With the documents that this

 4   letter says I have to have, the

 5   certificate of title, notarized copy of

 6   the title, government issued photo

 7   identification, I take this to the pound,

 8   the pound looks at it with the other

 9   document, do I get the vehicle back?

10              MR. HAZAN:  Objection.

11      A      I mean, reading what you just

12   read it would indicate that to me, but I

13   can't testify that that's true.

14      Q      What would make it not true?

15              MR. HAZAN:  Objection.

16      A      The letter appears to give

17   authority to the person named on it to

18   pick up the vehicle that's about the most

19   I can state.

20      Q      If this didn't give me authority

21   to pick up my car or if this didn't give

22   the person named on here or entity

23   authority to pick up the car, then what

24   value would this document be?

25              MR. HAZAN:  Objection.
```

84

```
 1            ROUGH DRAFT

 2      A    I don't know.

 3      Q    I don't either.  Okay.  If you

 4   wish to have a minute with the witness you

 5   may, but writing notes down on your pad,

 6   I'm not going to tolerate and I'm going to

 7   ask for a copy of the notes that you are

 8   making and crossing out if this continues?

 9           MR. HAZAN:  I'm not writing

10      notes on my pad.

11           MR. KESSLER:  You wrote the word

12      no, you wrote the word which I can

13      read upside down, so please.

14           THE WITNESS:  Can we take a

15      break then?

16           MR. KESSLER:  Sure.

17           Off the record.

18           (Discussion off the record.)

19               (Brief recess was

20      taken.)

21      Q    Back on the record.  Just as a

22   statement for the record, and I know I

23   don't have to tell you this.  You are the

24   one under oath.  I don't want anything

25   that is not true, I don't want anything
```

1             ROUGH DRAFT

2    that is fabricated or false from your

3    testimony.  Your attorney can say whatever

4    he wants, he's not the one under oath.

5    Okay.  So if you don't know, you don't

6    know, if you do know, please give the

7    correct and truthful answer.  That's all

8    I'm asking from you here.

9             Refer to Plaintiff's Exhibit 1

10   please.  We said earlier bottom of page

11   one there is an entry on July 10, 2006, do

12   you see that?

13       A    I do.

14       Q    Which has your initials at the

15   end of the entry.  Do you recall what

16   happened on or about July 10, 2006, that

17   caused you to make that entry?

18       A    I do not.

19       Q    Let me show you what has been

20   marked Plaintiff's Exhibits 6 and 7, do

21   these documents refresh your recollection

22   as to what may have happened on July 10,

23   2006, to cause you to make that entry?

24       A    It does not refresh any

25   recollection, no.

```
 1              ROUGH DRAFT

 2      Q       Do you know who Crossland Group

 3  is?

 4      A       I don't.

 5      Q       These are documents that were

 6  produced to us I believe by the City by

 7  way of Honda financial or maybe Honda

 8  directly provided it to us.  Have you ever

 9  seen these documents before?

10      A       No, not that I recall.

11      Q       On Plaintiff's 7, it indicates

12  let's take the entry dated 7-6, I think

13  that says AG we spoke with George at legal

14  bureau would that be you?

15      A       I have no way of knowing.

16      Q       No recollection whatsoever?

17      A       None whatsoever.

18      Q       Did you receive on a regular

19  basis many calls from either leasing

20  companies or the towing companies

21  regarding various cars?

22              MR. HAZAN:  Objection.

23      A       I don't recall calls from

24  leasing companies and tow companies in

25  particular, no.
```

1               ROUGH DRAFT

2       Q       Would it be something, did you

3    have a journal or some book that you kept

4    your entries for the day in while you were

5    at the Civil Enforcement Unit?

6       A       No.  What kind of entries?

7       Q       I don't know.  We would call

8    them time sheets, but I don't know what

9    they would be called with Civil

10   Enforcement Unit?

11      A       No, nothing like that that I can

12   recall.

13      Q       Would a call from a leasing

14   company or a tow truck company in general

15   stand out for you as something being very

16   different or unique?

17      A       I don't recall how I would have

18   reacted to that at the time, no.

19      Q       You've received more than one

20   call from a leasing company during your

21   two and a half years with the Civil

22   Enforcement Unit, is that a fair

23   statement, you've spoken to them

24   periodically, depending on the case you

25   were working on?

88

```
 1           ROUGH DRAFT
 2     A     I don't recall any calls from
 3  leasing companies.
 4     Q     Do you recall any calls from tow
 5  truck operators?
 6     A     No.
 7     Q     In June and July of 2006, was
 8  there another George working at Civil
 9  Enforcement unit?
10     A     Not that I know.
11     Q     Were you ever involved in a case
12  where there were competing claims to a
13  particular vehicle?
14           MR. HAZAN:  Objection.
15     A     None that I can recall.
16     Q     To your knowledge, did there
17  come a time when you received a copy of
18  the district attorney's release in the
19  Kapiti case?
20     A     Not that I remember.
21     Q     Looking at Plaintiff's
22  Exhibit 1, does it refresh your
23  recollection?
24     A     There's nothing in Plaintiff's
25  Exhibit 1 that refreshes my recollection
```

```
                    ROUGH DRAFT
 1
 2   as to whether or not I received or our
 3   office received a district attorney's
 4   release.
 5        Q     I'm going to go back for a
 6   minute to Plaintiff's 3, 4 and 5, those
 7   are the three documents, the packet that
 8   you referred to?
 9        A     Okay.
10        Q     This case involves Honda, so if
11   you want to relate it to this case you
12   may, but I'm asking more of a general
13   question, how is the release given to the
14   claimant of the vehicle when the vehicle
15   is returned to the claimant, how is that
16   done; is it mailed, is it picked up by the
17   claimant, in general in your experience,
18   how is that done?
19             MR. HAZAN:  Objection.
20        A     I definitely do not remember,
21   any of the above is certainly possible.
22        Q     You indicated that Plaintiff's 3
23   and 4 are internal documents, correct?
24        A     Correct.
25        Q     So if a vehicle was being
```

```
 1              ROUGH DRAFT
 2   released, let's say to Mr. Kapiti or to
 3   Honda, they would not be given Plaintiff's
 4   3 and/or 4, is that a correct statement?
 5              MR. HAZAN:  Objection.
 6      A     I can't say for certain.
 7      Q     Is it usual that those documents
 8   are released other than in litigation or
 9   do they remain part of the City's file?
10              MR. HAZAN:  Objection.
11      A     I couldn't say other than I have
12   not released them to anyone.
13      Q     That's what I'm asking for, you
14   haven't.  Have you released a document
15   similar to Plaintiff's 5 to a claimant?
16      A     Not that I recall and, in fact,
17   I would really have to clarify my answer
18   to the last question, it's not that I
19   haven't released them, it's that I don't
20   recall if I released them.
21      Q     Have you ever released a vehicle
22   in any one of your cases?
23              MR. HAZAN:  Objection.
24      A     Well, again, the phrase release.
25      Q     Authorized the release?
```

1              ROUGH DRAFT

2              MR. HAZAN:  Objection.

3      A      I didn't have the authority to

4      release vehicles.

5      Q      Have you ever recommended the

6      authorization to release a vehicle in a

7      case, other than this case?

8      A      It wasn't within my authority to

9      recommend the release on it.

10     Q      Take a look at the last line of

11     Plaintiffs' Exhibit 3?

12     A      Okay.

13     Q      What does it say?

14     A      I respectfully recommend that

15     the settlement be approved forthwith.

16     Q      And the settlement was what in

17     that case?

18     A      I don't recall.

19     Q      What does the document say?

20     A      The document reads what part

21     specifically.

22     Q      Well, the part that your

23     recommending?

24             MR. HAZAN:  Objection.

25     A      The document reads that we would

1            ROUGH DRAFT

2    return the subject vehicle to Honda in

3    consideration of an executed hold harmless

4    agreement by Honda.

5        Q      And that is, according to this

6    letter, your recommendation, correct?

7        A      It's my recommendation that the

8    settlement be approved and those appear to

9    be the terms of the settlement.

10        Q      That would involve the ultimate

11    release of the vehicle to Honda, correct?

12            MR. HAZAN:  Objection.

13        A      I mean, all I can testify to is

14    what it states here.  I mean, I don't know

15    what ultimately the outcome of that would

16    be.

17        Q      Any other cases where you

18    recommended that a settlement be approved

19    forthwith?

20        A      None that I can recall offhand.

21        Q      In the two and a half years that

22    you worked at civil enforcement?

23        A      I'm not saying it didn't happen.

24        Q      This is the only case that you

25    recommended that a settlement be approved?

1              ROUGH DRAFT

2      A      No, I'm simply stating that I

3    don't recall any other cases, in fact, I

4    don't recall any cases in which I approved

5    it.  I'm not stating it didn't happen, I'm

6    just saying I have no independent

7    recollection of doing it.

8      Q      But you don't have any

9    independent recollection of ever having

10   negotiated a settlement in any of the

11   cases?

12     A      Typically I didn't actually

13   negotiate settlements.  In fact, in

14   reading Plaintiffs' Exhibit 3, in looking

15   at it now, I would say this form letter

16   should be reworded to change the second

17   paragraph where it says I have negotiated

18   because, in fact, it would be more

19   accurate to state we or the office has

20   negotiated.

21     Q      If you weren't the one to go the

22   negotiation, who would it be?

23     A      I couldn't say, it's any number

24   of people in the office.

25     Q      What do you mean "any number of

```
 1              ROUGH DRAFT
 2   people in the office," would it be someone
 3   of the same level as you, one of your
 4   supervisors, who would it be?
 5        A     Again, I couldn't say.  I don't
 6   know.
 7        Q     So as you see this letter,
 8   Plaintiff's 3, even with the wording the
 9   way it is, you cannot state with certainty
10   that you were the individual who
11   negotiated the settlement on this case; is
12   that correct?
13        A     That's correct.
14        Q     And you have no recollection of
15   who that person might be?
16        A     No.
17        Q     Is there any document in the
18   files of the property clerk or the legal
19   bureau that might answer that question?
20              MR. HAZAN:  Objection.
21        A     I definitely don't know.
22              MR. KESSLER:  Off the record.
23              (Discussion off the record.)
24        Q     Back on the record.
25              Let me show you Plaintiff's
```

```
 1          ROUGH DRAFT
 2    Exhibits 8 and 9.  These are two documents
 3    that were produced by Honda.  Have you
 4    ever seen them before?
 5         A    Not that I remember.
 6         Q    Do you know what they are?
 7         A    I don't.
 8         Q    The first one, Plaintiff's 8,
 9    was turned over as an invoice that it
10    received from the tow truck company,
11    regarding this case and at least the
12    document you'll see Mark Kapiti on the
13    right-hand side '06 Acura and the vehicle
14    identification number, do you see that?
15         A    I do.
16         Q    And it's marked invoice, do you
17    see that?
18         A    Yes.
19         Q    In the middle of the page?
20         A    Yes.
21         Q    You have no knowledge, do you,
22    as to whether this invoice was paid or to
23    whom?
24         A    No, I have no knowledge at all
25    about this.
```

```
 1              ROUGH DRAFT

 2     Q     Do you know who would?

 3     A     No.

 4     Q     Do you know if it is within the

 5   City's usual business practices to retain

 6   a document such as this?

 7            MR. HAZAN:  Objection.

 8     A     I definitely don't know.

 9     Q     On the bottom section of

10   Plaintiff's 8, it indicates that three

11   stops were made, do you see that unit

12   picked up out of college point auto pound

13   three stops, and it has 1, 2 and 3, the

14   first one being legal bureau, 2 Lafayette

15   Street NYC, do you have any recollection

16   of meeting with or speaking to anybody

17   from the Crossland Group regarding this

18   vehicle?

19     A     No, I don't.

20     Q     College Point Auto Pound, is

21   that what we refer to as the College Point

22   Pound out in Queens?

23            MR. HAZAN:  Objection.

24     A     I didn't right it so I don't

25   know what they are referring to.
```

```
 1              ROUGH DRAFT

 2     Q      When someone talks about a

 3   vehicle being at the College Point Pound,

 4   where would that be?

 5              MR. HAZAN:  Objection.

 6     A      It depends on whose talking

 7   about it.

 8     Q      Is there more than one College

 9   Point Pound?

10     A      There's a College Point Pound

11   that I'm familiar with.

12     Q      Where is that?

13     A      It's in College Point, New York,

14   College Point, Queens.

15     Q      And is that the address for it?

16     A      I don't recall.

17     Q      And the item number three Eerie

18   EERIE Basin Impound Columbus Avenue,

19   Brooklyn, New York, what is that?

20              MR. HAZAN:  Objection.

21     A      Again, I didn't write it, so I

22   don't know.

23     Q      Do you have any idea what that

24   refers to?

25              MR. HAZAN:  Objection.
```

98

```
 1            ROUGH DRAFT

 2      A      I didn't write it, so I couldn't

 3 say what it's referring to.  I do know

 4 there is a pound in Brooklyn, New York.  I

 5 don't know that this refers to it or what

 6 it refers to.

 7      Q      Have you ever heard of the Eerie

 8 Basin Impound?

 9      A      The phrase sounds familiar, I

10 couldn't say for sure.

11      Q      On the next line it says no

12 money paid out as this was a leased

13 vehicle, do you know what that refers to?

14      A      No.

15      Q      Do you know what it means?

16      A      Just based on what I'm reading,

17 I have no idea what they are referring to

18 though.

19      Q      How about the final line here,

20 service fee had to retrieve, you know what

21 the word after retrieve is DAS, DAS had to

22 retrieve DAS release before legal bureau

23 would allow pick up of unit copy attached,

24 were you involved in whatever that is?

25      A      Not that I recall.
```

```
 1              ROUGH DRAFT

 2     Q      Plaintiff's 9.  Have you ever

 3   seen this before?

 4              MR. HAZAN:  Objection.

 5     A      Not that I remember.

 6     Q      Do you know what it is?

 7     A      No.

 8     Q      Have you ever seen this type of

 9   form before?

10     A      Not that I remember.

11     Q      You see at the top it says New

12   York State Department of Motor Vehicles?

13     A      Yes.

14     Q      Does it mean anything to you as

15   far as what the document is, does it

16   refresh your recollection?

17     A      I have no recollection of what

18   the document is.

19     Q      Have you ever seen a notice of

20   repossession?

21     A      Not that I remember, no.

22     Q      In any case?

23     A      No.  Not that I remember.

24     Q      Do you have any knowledge of

25   what happened in Mr. Kapiti's criminal
```

1              ROUGH DRAFT

2    case?

3       A    I do not.

4       Q    Does Plaintiff's 1 refresh your

5    recollection?

6       A    I mean I've reviewed Plaintiff's

7    one a few times now it hasn't refreshed my

8    recollection for anything about this.  Is

9    there anything in particular you want to

10   point out, otherwise my answer is no.

11      Q    The top entry after notes, so it

12   would be the most recent entry?

13      A    Okay.

14      Q    Dated 12-19-2006?

15      A    I see the entry you are

16   referring to.

17      Q    Does that refresh your memory as

18   far as the result of Mr. Kapiti's trial?

19      A    No, it doesn't refresh any

20   independent recollection of the results of

21   his trial.

22      Q    You never knew what happened to

23   his case?

24           MR. HAZAN:  Objection.

25      Q    Is that correct?

```
 1              ROUGH DRAFT

 2     A     I don't know that I didn't know,

 3  I know that if I did know, I don't

 4  remember now.

 5     Q     Were you still working on this

 6  case on December 19, 2006?

 7     A     I don't recall.  I definitely

 8  don't remember.

 9     Q     Are you familiar with the

10  forfeiture statutes in New York?

11           MR. HAZAN:  Objection.

12     A     Presently, not very.

13     Q     Were you more familiar with them

14  in 2006?

15           MR. HAZAN:  Objection.

16     A     It's fair to say that in 2006 I

17  was more familiar with them than I am

18  today.

19     Q     Are you aware of the term

20  innocent owner?

21           MR. HAZAN:  Objection.

22     A     Explain aware, the phrase sounds

23  familiar to me, I couldn't exactly explain

24  it or define it for you right now.

25     Q     Would you have reason to use or
```

102

```
 1              ROUGH DRAFT
 2   to be knowledgeable of an innocent owner
 3   when you were dealing with forfeiture
 4   cases?
 5              MR. HAZAN:  Objection.
 6      A    I'm sorry the question again.
 7      Q    Was an innocent owner entitled
 8   to the return of his vehicle under the
 9   administrative code and under Krimstock
10   versus Kelly?
11              MR. HAZAN:  Objection.
12      A    I don't know.
13      Q    In 2006?
14      A    I don't know, or rather I don't
15   recall.
16      Q    In the OATH hearings that you
17   conducted, did you ever have a leasing
18   company appear at an OATH hearing?
19      A    I don't remember.
20      Q    If you did, I call for the
21   production of any documents where the
22   leasing company appeared in any of the
23   forfeiture cases, but that shouldn't be
24   difficult because there aren't any.
25              MR. HAZAN:  Your request is
```

```
 1              ROUGH DRAFT
 2      noted.  Please put it in writing.
 3              MR. KESSLER:  No, it's being
 4      requested now.
 5      Q       Did you ever read Krimstock
 6  versus Kelly?
 7              MR. HAZAN:  Objection.
 8      A       I can't say for certain if I
 9  ever read it in its entirety.
10      Q       Did you read parts?
11      A       Yes.
12      Q       As you recall, did the second
13  circuit make any distinction in Krimstock
14  between lessees and non lessees?
15              MR. HAZAN:  Objection.
16      A       I do not remember.
17      Q       Would it surprise you if I told
18  you that Krimstock referred to the
19  registered owner as opposed to the title
20  owner in its decision?
21              MR. HAZAN:  Objection.
22      A       The question is would that
23  surprise me.
24      Q       I'm asking you this because
25  you've testified regarding the titled
```

104

```
 1              ROUGH DRAFT
 2   owner and you've made a point instead of
 3   saying the owner you've made a point of
 4   using the term titled owner, so my
 5   question is would it surprise you if the
 6   second circuit decision under which we're
 7   doing what we're doing here, referred to
 8   registered owners as opposed to titled
 9   owners?
10              MR. HAZAN:  Objection.
11      A    I don't know what the
12   decision -- what the word registered owner
13   in the decision referred to, when I stated
14   titled owner I clarified and qualified it
15   with an explanation of what I interpreted
16   a titled owner to be, I won't hazard a
17   guess as to what the Krimstock opinion
18   means by registered owner.
19      Q    Based upon the documents that
20   you've seen in this case, do you agree
21   that Mr. Kapiti was the registered owner
22   of the vehicle?
23              MR. HAZAN:  Objection.
24      Q    I'll refer you to Plaintiff's 1
25   which seems to be a wealth of information
```

```
 1              ROUGH DRAFT

 2  today.

 3      A      No, I would agree that I would

 4  refer to him as the registered owner, but

 5  it's an important qualification and

 6  clarification of the term.

 7      Q      But more than that you don't

 8  recall what Krimstock said?

 9      A      Correct.

10      Q      What about the section 14-140 of

11  the New York City Administrative Code, do

12  you recall the details and the provisions

13  of that?

14      A      No.

15      Q      Do you recall the details and

16  provisions of the property clerk rules

17  regarding civil forfeiture matters?

18      A      No.

19      Q      What do you as the

20  representative of the city at an OATH

21  hearing have to prove before the oath

22  judge?

23              MR. HAZAN:  Objection.

24      A      I would need you to be a little

25  more specific.
```

```
 1            ROUGH DRAFT

 2     Q     What do you have to do to keep

 3  the car?

 4            MR. HAZAN:  Objection.

 5     A     I have two problems with the

 6  question.  The first is, I don't know

 7  presently what needs to be done and

 8  frankly, I don't recall what exactly I had

 9  to do at the time I was handling the

10  hearings.

11     Q     You don't remember?

12     A     Not exactly.

13     Q     What you had to prove?

14     A     I know we had to prove probable

15  cause for the arrest, that's as far as I

16  can recall specifically, the rest would be

17  guessing based on a hazy memory.

18     Q     Did you have to prove likelihood

19  of success in the forfeiture case?

20            MR. HAZAN:  Objection.

21     A     Again, the phrase sounds

22  familiar, but I can't testify for certain

23  that's what I had to prove.

24     Q     Did you have to prove that there

25  was no other basis for retention of the
```

```
 1              ROUGH DRAFT
 2   vehicle a less restrictive means of
 3   dealing with the forfeiture case and
 4   holding onto the car?
 5              MR. HAZAN:  Objection.
 6      A      I don't recall.  I couldn't say
 7   that for sure.
 8      Q      According to Plaintiff's 1, is
 9   it a correct statement that the City
10   retained Mr. Kapiti's car until after the
11   acquittal?
12              MR. HAZAN:  Objection.
13      Q      After his trial had concluded?
14      A      Well, I mean I certainly can't
15   state whether or not we kept or had the
16   car at any particular date, if you want to
17   point to something in particular.
18      Q      Just as far as the entries are
19   concerned?
20              MR. HAZAN:  Objection.
21      A      I really don't know, all I can
22   testify to -- first of all, the only thing
23   I can really testify to would be my own
24   entries and even those my independent
25   recollection would be hard to say with any
```

108

```
 1              ROUGH DRAFT
 2  certainty.
 3      Q      And just for the record, let's
 4  clarify a couple of things.   The
 5  December 19th, '06 entry, it has EMR, who
 6  would that be?
 7              MR. HAZAN:  Objection.
 8      Q      Do you see at the end of the
 9  entry?
10      A      I mean, I can't say for certain
11  who made the entry, EMR are the initials
12  of my supervisor Eva Marie Russo.
13      Q      Go to the next entry dated
14  September 21st, '06, and there are --
15  after the entry there are the initials RF,
16  assuming the person whose initials they
17  are made the entry who would that be?
18      A      I cannot say for sure, the only
19  thing I can say is R and F are the
20  initials of Rob Fodera.
21      Q      The next entry has EV, who would
22  that be?
23      A      Yeah, that I don't know.
24      Q      And the August 16th, entry has
25  KD, do you know who that is?
```

```
 1            ROUGH DRAFT

 2      A     I don't.

 3      Q     Other than Krimstock, the

 4   property clerk rules and the

 5   administrative code provisions, are there

 6   any other rules which the Civil

 7   Enforcement Unit uses in dealing with

 8   these types of cases, in forfeiture cases

 9   or retention cases, that you know of?

10            MR. HAZAN:  Objection.

11      Q     During the time that you were

12   there?

13            MR. HAZAN:  Objection.

14      A     None that I can recall.

15            MR. KESSLER:  Off the record.

16            (Discussion off the record.)

17      Q     Back on the record.

18            I'm going to keep the record

19   open pending the documents that we

20   requested, other than that I think I'm

21   finished for now.  Thank you.

22

23            (Time noted: 1:04 p.m.)

24

25
```