2007-016286
SF

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------X
MARK KAPITI,

                                    PLAINTIFF,

         -against-                  Index No.:


RAYMOND W. KELLY, in his official Capacity as COMMISSIONER of
NEW YORK CITY POLICE DEPARTMENT, PROPERTY CLERK, NEW YORK
CITY POLICE DEPARTMENT and THE CITY of NEW YORK,

                                    DEFENDANTS.
------------------------------------------------X
THE CITY OF NEW YORK,
                           THIRD-PARTY PLAINTIFF,



                        -against-

AMERICAN HONDA FINANCE CORPORATION d/b/a
HONDA FINANCIAL SERVICES,
                           THIRD-PARTY DEFENDANT.

------------------------------------------------X

                          DATE: May 30, 2008
                          TIME: 11:10 a.m.
```

EXAMINATION BEFORE TRIAL of the Defendant, AMERICAN HONDA FINANCE CORPORATION d/b/a HONDA FINANCIAL SERVICES, by a Witness, TARA SCHOOLKRAFT, taken by the Respective Parties, pursuant to a Court Order, held at the office of MICHAEL A. CARDOZO ESQ., CORPORATION COUNSEL, 100 Church Street, New York, New York 10007, before a Notary Public of the State of New York.

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

1

referring to?

MR. ROSENBERG: You're pointing to the notary's date?

THE WITNESS: No, that's not -- the notary's date would be down here; it's cut off. This is the date that I signed May 30, 2006, correct, yes.

Q. Prior to signing this document, did you have any communications with anybody from the police department or anybody from the Property Clerk's Office?

MR. ROSENBERG: That's what I asked you to fix. You said prior. Fix the time period prior. Do you mean from the beginning of the word did she ever speak to the Property Clerk's Office or in connection with this and some date.

MR. HAZAN: Well, you keep cutting me off from my question.

MR. ROSENBERG: Well, I'm trying to help you phrase the question. Pick a date.

Q. Anytime in the world prior to this May 30th, did you speak to somebody at the Property Clerk's Office or the NYPD about signing this document as it relates to Mr. Kapiti's vehicle?

A. No, I personally did not.

Q. How did you come to learn that the City of New York or the NYPD may be interested in signing an agreement with

1   Honda related to Mr. Kapiti's vehicle?

2       A.   It's been a policy and procedure that's been in
3   place for many years at Honda Finance.

4       Q.   So, do you automatically just sign and send these
5   documents related to any vehicle that's seized by the City of
6   New York?

7       A.   That was provided to us by the City, which was then
8   reviewed by our Counsel to make sure it's okay that we go
9   forth and sign it.

10      Q.   So, do you know who from the City provided it to
11  you?

12      A.   No, I don't.

13      Q.   Do you know when somebody from the City provided it
14  to you?

15      A.   No, I do not.

16      Q.   Do you know which Counsel from Honda it was
17  provided to?

18      A.   Scott Shay.

19      Q.   How do you know that?

20      A.   Because again, this has been in place many years.
21  And when I was a Collector and as a Collection Supervisor, a
22  Customer Account Supervisor, this has been in place, and
23  Scott Shay has been in that of position since --

24      Q.   So Scott Shay --

25           MR. KESSLER:  Since when?  You cut her off.

SCHOOLKRAFT

90

A. I don't know exactly how long he's been at Honda Finance. But, since my 10 years at Honda Finance, he's been there and been an attorney for us.

Q. Do you know whether Scott Shay was sent this particular form or are you basing that on the fact that he normally, during the course of his business, receives these forms from the City?

A. I don't know if he received this particular form.

Q. So, as it relates to Mr. Kapiti's car, one of those forms was sent to an attorney at Honda; correct? And you stated that then that attorney reviewed the form?

A. He reviewed it years ago. I don't know if it's this particular form or if words have changed over the years. But prior to us putting a policy in place and making sure that we're signing documents properly, he reviews documents from the City, from the State, whoever it may be. So, this has been approved.

Q. Yeah, I understand. But by an attorney?

A. By an attorney.

Q. It wasn't you who approved this?

A. No.

Q. You don't know what actions that attorney did to review the form?

A. No, I don't.

Q. You don't know if changes over the years have been

1   made to the form?

2      A.   No, I do not.

3      Q.   You don't know what legal objections Honda may have
4   had regarding the form?

5      A.   No, I do not.

6      Q.   You don't know about any negotiations, maybe
7   between Honda and the City of New York regarding that form?

8      A.   No, I do not.

9      Q.   You had no involvement in any of that?

10     A.   No, I did not.

11     Q.   You referred to a policy and practice. When you
12  refer to the policy and practice, are you referring to a
13  policy and practice that Honda has?

14         MR. ROSENBERG:   As opposed to who?

15         MR. HAZAN:   I was just clarifying who it was.
16      I'm not sure who.

17     Q.   Can you describe the policy and practice that
18  you're referring to?

19         MR. ROSENBERG:   Take him through the steps.

20     A.   Sure. The letter is sent to us through the City
21  stating that vehicle is in their possession for such and such
22  reason. That's sorted through our mail department. It's
23  given to a specific collector who manages this process. The
24  collector contacts the City to verify that the vehicle is
25  still in their possession. If the vehicle is still in their

SCHOOLKRAFT

1   possession, documents such as this, the
2   Hold-Harmless Letter, the No-Release Letter that was provided
3   by the City to Honda Finance, will be printed out through our
4   computer system on our letterhead; signed, notarized, and
5   over-nighted to Crossland Group.  Crossland then --
6          MR. HAZAN:  Can you just read back what
7      documents were signed and notarized?
8          (Whereupon, the referred to answer was read
9      back by the Reporter.)
10  A.   -- Crossland then takes the documents that we send
11  them and goes to the City.  I don't know exactly where they
12  go, but if the vehicle is still in the possession of the
13  City, Crossland fronts the fees that have been assessed to
14  that vehicle during the impound and then takes possession of
15  the car and brings it to their storage lot.  It may take a
16  couple of times for Crossland to go back and forth until the
17  vehicle is taken in their possession.  Sometimes it does
18  happen.
19  Q.   Would Crossland's activities be contained in
20  Honda's computer system; how many times they went?
21  A.   No, that would be in Crossland's computer system.
22  Q.   The first thing, you said that a collector from
23  Honda contacts the City?
24  A.   Correct.
25  Q.   In Mr. Kapiti's case, do you know who that

```
 1   collector was?
 2       A.   I do not.
 3       Q.   It wasn't you; correct?
 4       A.   No, it was not.
 5       Q.   Are you aware of the conversation that the
 6   collector had?  The content of the conversation that the
 7   collector had with whomever they contacted at the City?
 8       A.   No, I'm not aware.
 9       Q.   Were you aware of the content of that conversation?
10       A.   No.
11       Q.   Did you have any conversations with the collector
12   about Mr. Kapiti's car?
13       A.   I don't remember.
14       Q.   Now, you just described a process that occurs as it
15   relates to these agreements.  Is that process what occurred
16   in Mr. Kapiti's case?
17       A.   Yes.
18       Q.   That process is the policy and practice in place
19   that you were referring to earlier?
20       A.   Yes.
21       Q.   Is it always the customer account supervisors that
22   sign these agreements?
23       A.   Yes.
24       Q.   Before signing these agreements, was there any
25   other paperwork that you had to review related to Mr.
```

1    Q.   Can you review the document and tell me if
2  everything contained in the document is truthful?
3    A.   Number two states I was employed as a Customer
4  Account Representative and I was a Customer Account
5  Representative Supervisor.
6    Q.   Number two?
7       MR. KESSLER:  She's saying it says Customer
8    Account Representative, when, at that time, she was
9    a Customer Account Representative Supervisor.
10      THE WITNESS:  Yes, this is true.
11   Q.   Okay, I would like to direct your attention to
12 paragraph number seven.  The last sentence that states, "the
13 City did not intend for Honda to protect them for violation
14 of Mr. Kapiti's due process and civil rights," do you see
15 that?
16   A.   Yes.
17   Q.   How do you know that?
18   A.   I don't know that.
19   Q.   Is that truthful?
20   A.   Can you explain further, what you exactly mean.
21   Q.   What did you mean by that?
22   A.   I didn't write this.
23   Q.   Did you sign the end of the document?
24   A.   Yes, I did.
25   Q.   Did you read it before you signed it?

97

SCHOOLKRAFT

   1    A.   Yes, I did.

   2    Q.   You signed a document not knowing what the contents
3 meant?

   4    A.   I can't explain that.

   5    Q.   I would like to turn your attention to the first
6 page of the document, where it says "Tara L. Schoolkraft,
7 being duly sworn, deposes and says," do you see that?

   8    A.   Yes, I do.

   9    Q.   Do you understand what that means?

 10    A.   Yes.

 11    Q.   Can you tell me what your understanding of that is?

 12    A.   That this is true. As far as what I signed. But
13 I'm saying, I can't explain what that statement means.

 14    Q.   So, in other words, you didn't make that statement?

 15    A.   I did not make that statement, no.

 16    Q.   Are there any other statements in this document
17 that you did not make?

 18    A.   No.

 19    Q.   So, you made every statement in this document
20 except that one?

 21    A.   I can't answer that.

 22    Q.   Why not?

 23    A.   Because, I'm just saying, I can't answer that last
24 statement.

 25    Q.   I understand that you're saying you can't answer

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com