# Exhibit "1"

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------------------X
     MARK KAPITI,
 3
                                    PLAINTIFF,
 4
              -against-              Index No.:
 5


 6   RAYMOND W. KELLY, in his official Capacity as COMMISSIONER of
     NEW YORK CITY POLICE DEPARTMENT, PROPERTY CLERK, NEW YORK
 7   CITY POLICE DEPARTMENT and THE CITY of NEW YORK,

 8                                  DEFENDANTS.
     ------------------------------------------------X
 9   THE CITY OF NEW YORK,
                              THIRD-PARTY PLAINTIFF,
10

11
                          -against-
12
     AMERICAN HONDA FINANCE CORPORATION d/b/a
13   HONDA FINANCIAL SERVICES,
                              THIRD-PARTY DEFENDANT.
14
     ------------------------------------------------X
15
                          DATE: May 30, 2008
16                        TIME: 11:10 a.m.

17

18

19         EXAMINATION BEFORE TRIAL of the Defendant,

20   AMERICAN HONDA FINANCE CORPORATION d/b/a HONDA FINANCIAL

21   SERVICES, by a Witness, TARA SCHOOLKRAFT, taken by the

22   Respective Parties, pursuant to a Court Order, held at the

23   office of MICHAEL A. CARDOZO ESQ., CORPORATION COUNSEL, 100

24   Church Street, New York, New York 10007, before a Notary

25   Public of the State of New York.
```

1   any damage, expense or cost by the New York City Police
2   Department may suffer in connection with property vouchered
3   under Property Clerk, New York Police Department invoice,
4   number B103699."
5           MR. HAZAN:  For the record, witness is looking
6           at Exhibit X.
7   Q.   Again, directing your attention to the same
8   Defendants' Exhibit X, does it say anywhere in that document,
9   Defendants' Exhibit X, that the City did not intend for Honda
10  to protect them for violations of Mr. Kapiti's due process
11  and civil rights?
12  A.   No.
13  Q.   Now, I would like to direct your attention to
14  paragraph number five of what has been marked as Defendants'
15  Exhibit U.  Have you had a chance to review that?
16  A.   Yes.
17  Q.   The first sentence says "while I had authority to
18  execute --
19          THE WITNESS:  That's number six.
20  Q.   Let me direct your attention to number six first,
21  let me know when you had a chance to review that.
22  A.   Okay.
23  Q.   First sentence says "while I had authority to
24  execute those documents, the City of New York gave us no
25  other option," can you explain to me why you stated that the

SCHOOLKRAFT

1      City of New York gave us no other option?

2      A.   Because we had an interest in our vehicle.  It was

3  either give it to Honda Finance or do whatever the City does

4  with it.  So, no, we had no other option but to take

5  possession of the vehicle.  And protect that in the

6  Hold-Harmless Agreement that was executed by the words that

7  previously provided by the City?

8      Q.   How do you know that the City of New York gave

9  Honda no other option other than sign the Hold-Harmless

10  Agreement?

11     A.   I don't know that, personally.

12     Q.   So is this statement accurate?

13     A.   Yes, it is accurate.  Because in prior situations

14  the City gives no other option but to take possession of the

15  vehicle or do what they do with it.

16     Q.   Okay, let's talk about prior situations.  In prior

17  situations, how do you know that Honda had no other options

18  but to sign the Hold-Harmless Agreement?

19     A.   Because the first notification that we get from the

20  City gives us a certain amount of days to pick up that

21  vehicle from the City.  Or it goes to auction.  So, because

22  Honda Finance has a vested interest in that vehicle, we are

23  going to take possession of it and not lose out on money.

24     Q.   During that time period given to you by the City,

25  are you aware of whether or not the attorneys for Honda

1   discussed other options with the City?

2   A.  No, I'm not aware.

3   Q.  So, you don't know if other options are presented?

4   A.  No, because the attorneys don't get involved in

5   every case.

6   Q.  Again, you don't know if other options are

7   discussed?

8   A.  No.

9   Q.  Again, it wasn't you personally that made the

10  decisions for Honda to enter into these agreements, it was an

11  attorney; correct?

12  A.  Correct.

13  Q.  Now, I would like to direct your attention to

14  paragraph number five.  Just let me know when you're finished

15  looking at it?

16  A.  All set.

17  Q.  The first sentence of that paragraph states that

18  "the City of New York took the position that such a release

19  was a "take it or leave it" situation, did a representative

20  from the City ever communicate to you that such a release was

21  a take it or leave it situation?

22  A.  No.

23  Q.  How do you know that?

24  A.  It's take it or leave it.  You're paraphrasing

25  something.

1           MR. ROSENBERG:  It's in quotes.  You didn't
2      site it in quotes.  Are you asking the question
3      without the quote marks or with the quote marks?
4      When a question is given in quote marks, it has a
5      significance.
6           MR. HAZAN:  For the record.  The sentence that
7      I read has quotation marks around the terms take it
8      or leave it.
9           MR. ROSENBERG:  But you didn't read it that
10     way.
11          MR. HAZAN:  I'm clearing the record.
12    Q.   My question is, what did you mean by "take it or
13 leave it" in quotes?
14    A.   Take possession of the car or leave it.
15    Q.   Did you mean anything else by that?
16    A.   No.
17    Q.   Okay.  Again, how do you know that it was the City
18 of New York's position that such a release was a "take it or
19 leave it," in quotation marks, situation?
20    A.   Because the words that were used on the documents
21 that were sent to Honda Finance, are you have until this day
22 to take possession of your vehicle or leave it and it goes to
23 auction.
24    Q.   What documents are you referring to?
25    A.   The notice that the vehicle has been impounded.

1    Q.   Did you review that notice in the case involving
2  Mr. Kapiti's car?
3    A.   Yes.
4    Q.   That notice stated that Honda had a certain number
5  of days to sign the agreement or they couldn't retain the
6  vehicle?
7    A.   Correct.  Not sign the agreement, take possession
8  of the car or it goes to auction.
9    Q.   All right.  So does that letter make any mention of
10 an agreement between Honda --
11   A.   Once we contact the City to see if the vehicle is
12 still there, at that point and time they direct us on what
13 documents are necessary to take possession of the vehicle.
14   Q.   Again, I'm going back to the words, "take it or
15 leave it" situation.  Now, how did you know that the letter
16 that you just referred to, the notice that you just referred
17 to, sent by the City to Honda, did not permit Honda to
18 negotiate with the City about the agreement?
19        MR. ROSENBERG:  I'm going to object.  You've
20        asked the question three different times and she's
21        answered three different times.  The letter that
22        you are referring to directed her within ten days
23        to claim that vehicle.  She told you that they
24        provided those documents that were necessary and if
25        you didn't provide the documents, you didn't get

1           the car.  What was so hard to understand about
2           that.  Three times you've asked her that question.
3      Q.   I understand what the City said.  I'm asking
4  whether or not you had any knowledge about whether or not
5  that prevented Honda from making other offers to the City?
6           MR. ROSENBERG:  You mean like not sign the
7           agreement?
8           MR. HAZAN:   Having some sort of negotiation.
9      A.   That option was never provided or asked of Honda
10  Finance.  If you wanted to negotiate anything else.  We
11  called out, we said do you have possession of our vehicle?
12  Yes, we do.  What do we need to get it out?  We need this,
13  this, and this.  Okay, thank you.
14      Q.   Did you personally ever try to negotiate with the
15  City?
16      A.   No, I'm not in the position to negotiate.
17      Q.   Because attorneys would do that?
18      A.   No.  They're telling us what we need.  We're
19  abiding by the rules of City, the laws of the City.
20      Q.   What law of the City are you referring to?
21           MR. ROSENBERG:   Objection.
22      A.   You send us a letter, you tell us this vehicle has
23  been impounded.  It's been here since this date.  You have
24  until this date to get it out.  We contact the City, what do
25  we need to get this vehicle out?  Some instances may be just

SCHOOLKRAFT

1    the money to get it out, some others maybe all those
2    documents to get it out.  In this situation it was all these
3    documents.  We provided it, we got possession of the vehicle.
4         Q.   I'd like to show you what's been marked as
5    Defendants' Exhibit AA; NYC 184.  Just let me know when
6    you're done with that?
7         A.   Okay, I'm all set.
8         Q.   Do you recognize this document?
9         A.   No.
10        Q.   Have you ever seen this document before?
11        A.   I don't remember.
12        Q.   Do you see at the top of the document that it's
13   addressed to Tara L. Miles?
14        A.   Yes.
15        Q.   Do you know who Rudolph Mail was?
16        A.   Yes, I do.
17        Q.   Who was he?
18        A.   He's an outside counsel that Honda used.
19        Q.   If you, in fact, did read this letter and did
20   receive this letter, would you have noted that in the
21   computer system; the tracking system?
22        A.   Maybe, not necessarily.
23        Q.   If you look at the second paragraph of this letter
24   where it starts with "we need a court order," does this
25   letter refresh your memory in any way about whether or not a

SCHOOLKRAFT

```
 1          And second of all, Plaintiff never noticed a
 2          deposition for knowledge of specific facts that he
 3          was inquiring about.
 4              MR. KESSLER:  I'm sorry, is it the City's
 5          position that the Plaintiff never requested a
 6          witness with knowledge of this case?
 7              MR. HAZAN:  It's the City's position that the
 8          City objected to that notice of deposition because
 9          it was very broad and that the City provide
10          Plaintiff with a list of 20 people with knowledge
11          of the facts of the case.
12              MR. KESSLER:   It wasn't 20.
13              MR. HAZAN:  I don't know if it was 20, but
14          many.
15              MR. KESSLER:  This will be a matter taken up
16          with the Court.
17 EXAMINATION BY
18 MR. KESSLER:
19     Q.   I just have a few questions.  Defendants' Exhibit
20 X, which is the Hold-Harmless Agreement, the top of the page;
21 do you see where it says "May 24, 2006, 14:44 NYPD C.E.U.?"
22     A.   Yes.
23     Q.   Do you know what that is?
24     A.   I don't.  It's a fax transmittal, but I don't know
25 who is it going to or where is it coming from.
```

SCHOOLKRAFT

1    Q.    Does NYPD mean anything to you?

2    A.    New York City Police Department.

3    Q.    Do you know what C.E.U stands for?

4    A.    No.

5    Q.    On your fax machine in your office, is it your fax
6    machine that would note the May 24, 2006, NYPD C.E.U. or
7    would that be the fax coming into your office?

8    A.    That would be the fax coming into my office.

9    Q.    Take a look, if you will, at the paragraph
10   beginning furthermore.  And I can barely read this.  Now,
11   before we get to this paragraph.  You testified earlier that
12   this is the language that the City of New York Police
13   Department Property Clerk sends to Honda.  Honda, wishing the
14   car back, fills it out, signs it, and sends it back?

15   A.    Yes.

16         MR. HAZAN:    Objection to form.

17   Q.    When this document comes before you, and we can
18   refer to this specific document or the document in general,
19   it really doesn't matter to me.  You, Tara Schoolkraft, are
20   you able, are you authorized to change any of the language in
21   this agreement?

22   A.    No, we do not change the language, we only add the
23   vehicle and the customer's name.

24   Q.    So, the handwritten portion is what you add;
25   correct?

SCHOOLKRAFT

1    A.    Correct.

2    Q.    But everything else that's typeset, everything
3    else, that remains the way it is; correct?

4    A.    Correct.

5    Q.    It's not subject to negotiation?

6          MR. HAZAN:    Objection.

7    Q.    Now, looking at the paragraph that starts with,
8    furthermore.  I'm going to see if I can read it.  It says
9    "furthermore, whereas the subject vehicle has been seized,
10    and whereas releasee intends to commence or has commenced a
11    forfeiture action to obtain legal title to the subject
12    vehicle," I'm going to pause.  Do you see what I'm reading?

13    A.    Yes.

14    Q.    In this document, if you have to look above, please
15    do.  The releasee is who?

16    A.    Would be the Property Clerk, New York City Police
17    Department.

18    Q.    It also says "where as the releasee intends to
19    commence or has commenced the forfeiture action," do you see
20    that?  Regarding Mr. Kapiti, in this case, do you know if the
21    Property Clerk, New York City Police Department, that is the
22    releasee, ever commenced a forfeiture action to obtain legal
23    title to Mr. Kapiti's vehicle?

24    A.    I do not know.

25    Q.    Do you know if the New York City Police Department

SCHOOLKRAFT

1    Property Clerk ever intended to commence such an action?

2        A.    I do not know.

3        Q.    You mentioned that you've seen hundreds, or you've

4    been involved in hundreds of these types of cases?

5        A.    Yes.

6        Q.    Over the years that you've been there and that Mr.

7    Shay has been there; correct?

8        A.    Yes.

9        Q.    In any of those cases that you can remember, are

10   you aware of whether the New York City Police Department

11   Property Clerk ever commenced a forfeiture action to obtain

12   legal title to the vehicle prior to Honda's signing the

13   Hold-Harmless Letter?

14       A.    I'm not aware.

15       Q.    In any of those hundreds of cases, are you aware as

16   to whether the New York City Police Department Property Clerk

17   ever intended to commence a forfeiture action to obtain title

18   to the subject vehicle prior to Honda's signing off on the

19   Hold-Harmless Letter?

20              MR. HAZAN:   I object to the form.

21       A.    I'm not aware.

22       Q.    I appreciate you're not an attorney.  As whatever

23   your title was at the time at Honda when you received a

24   Hold-Harmless Agreement like this from the New York City

25   Police Department, did you ever have occasions or someone on

1   your behalf to appear at a hearing to testify prior to Honda

2   receiving the car back from the NYPD?

3               MR. HAZAN:   Objection to form.

4      A.   Not that I'm aware of.

5      Q.   Did you?

6      A.   No.

7      Q.   If I mentioned, OATH, would you know what I'm

8   talking about?

9      A.   No.

10     Q.   Did you ever appear in any court in New York City

11  to testify in relation to Honda's getting the car back from

12  the New York City Police Department?

13     A.   No.

14     Q.   Do you know of anyone under your supervision or

15  with the same degree and status as you who has appeared in

16  such a proceeding?

17     A.   No.

18              MR. KESSLER:   I'm going to call for the

19              production of any other Hold-Harmless Agreements

20              and related information that Honda Financial may

21              have with regard to the New York City Police

22              Department Property Clerk.  If the number is too

23              voluminous, as I'm hearing it might be, I would

24              request a reasonable number from every year in

25              which such agreements were signed or entered into

1   between Honda Financial and the New York City
2   Police Department. And if that is difficult to do.
3       MR. ROSENBERG: Are we talking about at least
4   during this witness' tenure? That's ten years.
5       MR. KESSLER: How about this, if Honda can
6   inform me as to when it commenced entering into
7   those types of agreements with the New York City
8   Police Department, and present a handful of
9   representative cases since that time to date, that
10  should be sufficient.
11      MR. ROSENBERG: I'll take the request under
12  advisement. I assume, regardless of my personal
13  opinions here, I assume that if Honda could provide
14  such information, they would expect to redact down
15  any sensitive or personal or privileged
16  information.
17      MR. KESSLER: I have no problem with that. I
18  would like to get a feel of the numbers that we're
19  talking about.
20      MR. HAZAN: I don't know that it does, but I
21  object to the extent that a production like that
22  would include information that is privileged
23  between Honda and the City. I don't have any
24  reason to believe that it does.
25  Q.  Take a look at Exhibit X one more time. Above your

1   name, above your signature there is a clause that says "in
2   witness whereof," do you see that?
3       A.   Yes.
4       Q.   Is there a date following that clause?
5       A.   Yes.
6       Q.   What's the date?
7       A.   30th day of May, 2006.
8       Q.   Is that the date that you are referring to that
9   refreshed your recollection as to when you signed this
10  document?
11      A.   Yes.
12      Q.   So that we finish the circle. The releasor in this
13  contract, in this Hold-Harmless Agreement, is whom?
14      A.   Honda Financial Services.
15      Q.   I'm showing you a document that's been previously
16  marked as Plaintiff's Exhibit 11. Do you know what this is?
17      A.   Yes.
18      Q.   What is this?
19      A.   This is a No-Release Letter.
20      Q.   Is that your signature above your name?
21      A.   Yes, it is.
22      Q.   What date did you sign it?
23      A.   May 30, 2006.
24      Q.   Was it signed contemporaneous with the
25  Hold-Harmless Agreement that's been marked as Defendants'

SCHOOLKRAFT

1      Exhibit X?

2      A.   Yes.

3      Q.   While you have it, take a look at what's been

4  marked as Defendants' Exhibit U.  You have both documents in

5  front of you?

6      A.   Yes.

7      Q.   Paragraph five of your affidavit, the second

8  sentence reads "as a matter of fact the language of the

9  release and the letter was prepared by the City of New York

10 and its representatives.  We were told to take the exact

11 language prepared by the City and place it on your

12 letterhead," do you see that?

13     A.   Yes.

14     Q.   Now, what I have shown you, Plaintiff's Exhibit 11,

15 is that the result of the preparation by the City of New York

16 and your taking the language prepared by the language of the

17 City and putting it on your letterhead?

18     A.   Yes.

19     Q.   So, this language was prepared by the City of New

20 York and you put it on Honda's letterhead; correct?

21     A.   Correct.

22     Q.   Then you signed the letter?

23     A.   Correct.

24     Q.   Let me refer you to Defendants' Exhibit LL.  Do you

25 see it?

1     A.    Yes.

2     Q.    This is the Condition Report that you referenced.

3     A.    Yes.

4     Q.    At the bottom of the page, is that your handwriting?

6     A.    No.

7     Q.    What does it say there?

8     A.    Dead battery. 10 Long Grain Court, Bohemia, New York.

10    Q.    Other than the first two words, does that sound like an address to you?

12    A.    Yes.

13    Q.    When you said earlier that it didn't appear that there wasn't any damage to the vehicle, when you talk about damage, are you including a dead battery?

16    A.    No.

17    Q.    You're talking about physical damage to the car?

18    A.    Yes.

19    Q.    Is there any way, either from your knowledge or from looking at this Condition Report, for you to verify that there, in fact, was no damage at all to the vehicle at the time it was picked up by Honda from the NYPD?

23    A.    I can't say that there was no damage to this vehicle.

25    Q.    I'm sorry to do this. Let me take you back to