1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------------------------X
   MARK KAPITI,
3
                                  PLAINTIFF,
4
             -against-           Index No.:
5

6  RAYMOND W. KELLY, in his official Capacity as COMMISSIONER of
   NEW YORK CITY POLICE DEPARTMENT, PROPERTY CLERK, NEW YORK
7  CITY POLICE DEPARTMENT and THE CITY of NEW YORK,

8                                 DEFENDANTS.
   ------------------------------------------------X
9  THE CITY OF NEW YORK,
                         THIRD-PARTY PLAINTIFF,
10

11
                        -against-
12
   AMERICAN HONDA FINANCE CORPORATION d/b/a
13 HONDA FINANCIAL SERVICES,
                         THIRD-PARTY DEFENDANT.
14
   ------------------------------------------------X
15
                        DATE: May 30, 2008
16                      TIME: 11:10 a.m.

17

18

19        EXAMINATION BEFORE TRIAL of the Defendant,

20  AMERICAN HONDA FINANCE CORPORATION d/b/a HONDA FINANCIAL

21  SERVICES, by a Witness, TARA SCHOOLKRAFT, taken by the

22  Respective Parties, pursuant to a Court Order, held at the

23  office of MICHAEL A. CARDOZO ESQ., CORPORATION COUNSEL, 100

24  Church Street, New York, New York 10007, before a Notary

25  Public of the State of New York.


   DIAMOND REPORTING  (718) 624-7200  info@diamondreporting.com
                        1

SCHOOLKRAFT

1       discussed other options with the City?

2              A.     No, I'm not aware.

3              Q.     So, you don't know if other options are presented?

4              A.     No, because the attorneys don't get involved in

5       every case.

6              Q.     Again, you don't know if other options are

7       discussed?

8              A.     No.

9              Q.     Again, it wasn't you personally that made the

10      decisions for Honda to enter into these agreements, it was an

11      attorney; correct?

12             A.     Correct.

13             Q.     Now, I would like to direct your attention to

14      paragraph number five.  Just let me know when you're finished

15      looking at it?

16             A.     All set.

17             Q.     The first sentence of that paragraph states that

18      "the City of New York took the position that such a release

19      was a "take it or leave it" situation, did a representative

20      from the City ever communicate to you that such a release was

21      a take it or leave it situation?

22             A.     No.

23             Q.     How do you know that?

24             A.     It's take it or leave it.  You're paraphrasing

25      something.

SCHOOLKRAFT

1              MR. ROSENBERG:    It's in quotes.  You didn't

2        site it in quotes.  Are you asking the question

3        without the quote marks or with the quote marks?

4        When a question is given in quote marks, it has a

5        significance.

6              MR. HAZAN:  For the record.  The sentence that

7        I read has quotation marks around the terms take it

8        or leave it.

9              MR. ROSENBERG:    But you didn't read it that

10       way.

11             MR. HAZAN:  I'm clearing the record.

12       Q.    My question is, what did you mean by "take it or

13  leave it" in quotes?

14       A.    Take possession of the car or leave it.

15       Q.    Did you mean anything else by that?

16       A.    No.

17       Q.    Okay.  Again, how do you know that it was the City

18  of New York's position that such a release was a "take it or

19  leave it," in quotation marks, situation?

20       A.    Because the words that were used on the documents

21  that were sent to Honda Finance, are you have until this day

22  to take possession of your vehicle or leave it and it goes to

23  auction.

24       Q.    What documents are you referring to?

25       A.    The notice that the vehicle has been impounded.

SCHOOLKRAFT

1      Q.    Did you review that notice in the case involving

2   Mr. Kapiti's car?

3      A.    Yes.

4      Q.    That notice stated that Honda had a certain number

5   of days to sign the agreement or they couldn't retain the

6   vehicle?

7      A.    Correct.  Not sign the agreement, take possession

8   of the car or it goes to auction.

9      Q.    All right.  So does that letter make any mention of

10  an agreement between Honda --

11     A.    Once we contact the City to see if the vehicle is

12  still there, at that point and time they direct us on what

13  documents are necessary to take possession of the vehicle.

14     Q.    Again, I'm going back to the words, "take it or

15  leave it" situation.  Now, how did you know that the letter

16  that you just referred to, the notice that you just referred

17  to, sent by the City to Honda, did not permit Honda to

18  negotiate with the City about the agreement?

19                 MR. ROSENBERG:  I'm going to object.  You've

20                 asked the question three different times and she's

21                 answered three different times.  The letter that

22                 you are referring to directed her within ten days

23                 to claim that vehicle.  She told you that they

24                 provided those documents that were necessary and if

25                 you didn't provide the documents, you didn't get

SCHOOLKRAFT

1              the car.  What was so hard to understand about

2              that.  Three times you've asked her that question.

3         Q.    I understand what the City said.  I'm asking

4    whether or not you had any knowledge about whether or not

5    that prevented Honda from making other offers to the City?

6              MR. ROSENBERG:  You mean like not sign the

7              agreement?

8              MR. HAZAN:   Having some sort of negotiation.

9         A.    That option was never provided or asked of Honda

10   Finance.  If you wanted to negotiate anything else.  We

11   called out, we said do you have possession of our vehicle?

12   Yes, we do.  What do we need to get it out?  We need this,

13   this, and this.  Okay, thank you.

14        Q.    Did you personally ever try to negotiate with the

15   City?

16        A.    No, I'm not in the position to negotiate.

17        Q.    Because attorneys would do that?

18        A.    No.  They're telling us what we need.  We're

19   abiding by the rules of City, the laws of the City.

20        Q.    What law of the City are you referring to?

21              MR. ROSENBERG:   Objection.

22        A.    You send us a letter, you tell us this vehicle has

23   been impounded.  It's been here since this date.  You have

24   until this date to get it out.  We contact the City, what do

25   we need to get this vehicle out?  Some instances may be just

SCHOOLKRAFT

1    And second of all, Plaintiff never noticed a

2    deposition for knowledge of specific facts that he

3    was inquiring about.

4        MR. KESSLER:  I'm sorry, is it the City's

5    position that the Plaintiff never requested a

6    witness with knowledge of this case?

7        MR. HAZAN:  It's the City's position that the

8    City objected to that notice of deposition because

9    it was very broad and that the City provide

10   Plaintiff with a list of 20 people with knowledge

11   of the facts of the case.

12       MR. KESSLER:   It wasn't 20.

13       MR. HAZAN:  I don't know if it was 20, but

14   many.

15       MR. KESSLER:  This will be a matter taken up

16   with the Court.

17   EXAMINATION BY

18   MR. KESSLER:

19       Q.   I just have a few questions.  Defendants' Exhibit

20   X, which is the Hold-Harmless Agreement, the top of the page;

21   do you see where it says "May 24, 2006, 14:44 NYPD C.E.U.?"

22       A.   Yes.

23       Q.   Do you know what that is?

24       A.   I don't.  It's a fax transmittal, but I don't know

25   who is it going to or where is it coming from.

SCHOOLKRAFT

1      Q.    Does NYPD mean anything to you?

2      A.    New York City Police Department.

3      Q.    Do you know what C.E.U stands for?

4      A.    No.

5      Q.    On your fax machine in your office, is it your fax

6    machine that would note the May 24, 2006, NYPD C.E.U. or

7    would that be the fax coming into your office?

8      A.    That would be the fax coming into my office.

9      Q.    Take a look, if you will, at the paragraph

10   beginning furthermore.  And I can barely read this.  Now,

11   before we get to this paragraph.  You testified earlier that

12   this is the language that the City of New York Police

13   Department Property Clerk sends to Honda.  Honda, wishing the

14   car back, fills it out, signs it, and sends it back?

15     A.    Yes.

16               MR. HAZAN:    Objection to form.

17     Q.    When this document comes before you, and we can

18   refer to this specific document or the document in general,

19   it really doesn't matter to me.  You, Tara Schoolkraft, are

20   you able, are you authorized to change any of the language in

21   this agreement?

22     A.    No, we do not change the language, we only add the

23   vehicle and the customer's name.

24     Q.    So, the handwritten portion is what you add;

25   correct?

117

SCHOOLKRAFT

1      A.    Correct.

2      Q.    But everything else that's typeset, everything

3    else, that remains the way it is; correct?

4      A.    Correct.

5      Q.    It's not subject to negotiation?

6            MR. HAZAN:    Objection.

7      Q.    Now, looking at the paragraph that starts with,

8    furthermore.  I'm going to see if I can read it.  It says

9    "furthermore, whereas the subject vehicle has been seized,

10   and whereas releasee intends to commence or has commenced a

11   forfeiture action to obtain legal title to the subject

12   vehicle," I'm going to pause.  Do you see what I'm reading?

13     A.    Yes.

14     Q.    In this document, if you have to look above, please

15   do.  The releasee is who?

16     A.    Would be the Property Clerk, New York City Police

17   Department.

18     Q.    It also says "where as the releasee intends to

19   commence or has commenced the forfeiture action," do you see

20   that?  Regarding Mr. Kapiti, in this case, do you know if the

21   Property Clerk, New York City Police Department, that is the

22   releasee, ever commenced a forfeiture action to obtain legal

23   title to Mr. Kapiti's vehicle?

24     A.    I do not know.

25     Q.    Do you know if the New York City Police Department

SCHOOLKRAFT

1  Property Clerk ever intended to commence such an action?

2       A.    I do not know.

3       Q.    You mentioned that you've seen hundreds, or you've

4  been involved in hundreds of these types of cases?

5       A.    Yes.

6       Q.    Over the years that you've been there and that Mr.

7  Shay has been there; correct?

8       A.    Yes.

9       Q.    In any of those cases that you can remember, are

10  you aware of whether the New York City Police Department

11  Property Clerk ever commenced a forfeiture action to obtain

12  legal title to the vehicle prior to Honda's signing the

13  Hold-Harmless Letter?

14       A.    I'm not aware.

15       Q.    In any of those hundreds of cases, are you aware as

16  to whether the New York City Police Department Property Clerk

17  ever intended to commence a forfeiture action to obtain title

18  to the subject vehicle prior to Honda's signing off on the

19  Hold-Harmless Letter?

20            MR. HAZAN:    I object to the form.

21       A.    I'm not aware.

22       Q.    I appreciate you're not an attorney.  As whatever

23  your title was at the time at Honda when you received a

24  Hold-Harmless Agreement like this from the New York City

25  Police Department, did you ever have occasions or someone on

SCHOOLKRAFT

1      Property Clerk ever intended to commence such an action?

2           A.    I do not know.

3           Q.    You mentioned that you've seen hundreds, or you've

4      been involved in hundreds of these types of cases?

5           A.    Yes.

6           Q.    Over the years that you've been there and that Mr.

7      Shay has been there; correct?

8           A.    Yes.

9           Q.    In any of those cases that you can remember, are

10     you aware of whether the New York City Police Department

11     Property Clerk ever commenced a forfeiture action to obtain

12     legal title to the vehicle prior to Honda's signing the

13     Hold-Harmless Letter?

14          A.    I'm not aware.

15          Q.    In any of those hundreds of cases, are you aware as

16     to whether the New York City Police Department Property Clerk

17     ever intended to commence a forfeiture action to obtain title

18     to the subject vehicle prior to Honda's signing off on the

19     Hold-Harmless Letter?

20               MR. HAZAN:    I object to the form.

21          A.    I'm not aware.

22          Q.    I appreciate you're not an attorney.  As whatever

23     your title was at the time at Honda when you received a

24     Hold-Harmless Agreement like this from the New York City

25     Police Department, did you ever have occasions or someone on

SCHOOLKRAFT

1    your behalf to appear at a hearing to testify prior to Honda

2    receiving the car back from the NYPD?

3                    MR. HAZAN:    Objection to form.

4         A.    Not that I'm aware of.

5         Q.    Did you?

6         A.    No.

7         Q.    If I mentioned, OATH, would you know what I'm

8    talking about?

9         A.    No.

10        Q.    Did you ever appear in any court in New York City

11   to testify in relation to Honda's getting the car back from

12   the New York City Police Department?

13        A.    No.

14        Q.    Do you know of anyone under your supervision or

15   with the same degree and status as you who has appeared in

16   such a proceeding?

17        A.    No.

18                    MR. KESSLER:    I'm going to call for the

19                    production of any other Hold-Harmless Agreements

20                    and related information that Honda Financial may

21                    have with regard to the New York City Police

22                    Department Property Clerk.  If the number is too

23                    voluminous, as I'm hearing it might be, I would

24                    request a reasonable number from every year in

25                    which such agreements were signed or entered into

SCHOOLKRAFT

1    name, above your signature there is a clause that says "in

2    witness whereof," do you see that?

3         A.    Yes.

4         Q.    Is there a date following that clause?

5         A.    Yes.

6         Q.    What's the date?

7         A.    30th day of May, 2006.

8         Q.    Is that the date that you are referring to that

9    refreshed your recollection as to when you signed this

10   document?

11        A.    Yes.

12        Q.    So that we finish the circle.  The releasor in this

13   contract, in this Hold-Harmless Agreement, is whom?

14        A.    Honda Financial Services.

15        Q.    I'm showing you a document that's been previously

16   marked as Plaintiff's Exhibit 11.  Do you know what this is?

17        A.    Yes.

18        Q.    What is this?

19        A.    This is a No-Release Letter.

20        Q.    Is that your signature above your name?

21        A.    Yes, it is.

22        Q.    What date did you sign it?

23        A.    May 30, 2006.

24        Q.    Was it signed contemporaneous with the

25   Hold-Harmless Agreement that's been marked as Defendants'

SCHOOLKRAFT

1    Exhibit X?

2         A.    Yes.

3         Q.    While you have it, take a look at what's been

4    marked as Defendants' Exhibit U.  You have both documents in

5    front of you?

6         A.    Yes.

7         Q.    Paragraph five of your affidavit, the second

8    sentence reads "as a matter of fact the language of the

9    release and the letter was prepared by the City of New York

10   and its representatives.  We were told to take the exact

11   language prepared by the City and place it on your

12   letterhead," do you see that?

13        A.    Yes.

14        Q.    Now, what I have shown you, Plaintiff's Exhibit 11,

15   is that the result of the preparation by the City of New York

16   and your taking the language prepared by the language of the

17   City and putting it on your letterhead?

18        A.    Yes.

19        Q.    So, this language was prepared by the City of New

20   York and you put it on Honda's letterhead; correct?

21        A.    Correct.

22        Q.    Then you signed the letter?

23        A.    Correct.

24        Q.    Let me refer you to Defendants' Exhibit LL.  Do you

25   see it?

SCHOOLKRAFT

1          A.    Correct.

2          Q.    Go to the previous page; NYC 173, if you would, and

3     the entry of 04/14/2006.

4          A.    Yes.

5          Q.    That is for an invoice; correct?

6          A.    Correct.

7          Q.    Go again to the fourth column from the left, four

8     lines down, as of April 14th, action 2006, how much was past

9     due on this account?

10         A.    Zero dollars.

11         Q.    Please, go up to the entry, 05/15/2006, which would

12    be two entries above where we are.  Then go to the fourth and

13    fifth columns where it says "total past due," that entry for

14    May 15, 2006 is an invoice; correct?

15         A.    Correct.

16         Q.    You said this is actually the invoice for June,

17    2006; correct?

18         A.    Correct.

19         Q.    So, go to the next to column, and as of 5/30/2006?

20         A.    No, it would be as of 5/15/2006.

21         Q.    So, as of 5/15/2006 the total past due on this

22    account is?

23         A.    Zero dollars.

24         Q.    So, as of June you indicated that a payment, the

25    regular payment.  The next entry, 06/06/2006?

SCHOOLKRAFT

```
 1         A.    Yes.

 2         Q.    Which says "Regular Payment?"

 3         A.    Yes.

 4         Q.    There is an amount in the next to the last column

 5    on the right?

 6         A.    Yes.

 7         Q.    What is that?

 8         A.    $504.00.

 9         Q.    That indicates, as you said, that a regular payment

10    was made of $504 on June 6, 2006.

11         A.    Correct.

12         Q.    The entry above indicates "regular payments

13    reversal," and the right column says "lockbox reject?"

14         A.    Correct.

15         Q.    Does it indicate why the payment was not accepted?

16         A.    Not on this screen.

17         Q.    Would you know by looking at this why the payment

18    was not accepted.

19         A.    No.

20         Q.    From this can you tell me if the payment was made

21    and rejected or not made at all?

22         A.    Made and rejected.

23         Q.    So, the payment was made?

24              MR. HAZAN:    Objection to the form of that

25              question.
```

SCHOOLKRAFT

1          MR. HAZAN:    Objection to the form of the

2          question.

3     A.    If we took possession of the vehicle first and he

4     settled, it would go on as a satisfied repossession with no

5     balance.

6     Q.    What do you mean by first?

7     A.    If the customer was past due or in an impound

8     situation and we take possession of the vehicle, within four

9     hours we're required to notify the credit bureaus of the

10    account status.  So we'll notify that a repossession has

11    taken place; voluntary or involuntary.  If a customer then

12    turns and pays that account with Honda Finance, it still goes

13    down as a repossession but now it's a paid repossession.

14    Q.    If you know, how does that classification reflect

15    the person's credit history?

16    A.    Still negatively because it's a repossession.

17    Q.    So, as long as it shows a repossession, that

18    category is going to have a negative impact on the customer's

19    credit rating?

20    A.    Yes.

21    Q.    Honda was first notified about the impound by the

22    New York City Police Department; correct?

23    A.    Correct.

24    Q.    To your knowledge, was that done in writing or by

25    telephone?

SCHOOLKRAFT

1      A.    In writing.

2      Q.    Do you know how long after the impound Honda was

3    notified?

4      A.    No, I do not.

5      Q.    Without having been notified by the NYPD regarding

6    the impound of Mr. Kapiti's car, if Mr. Kapiti had continued

7    to pay his lease would Honda have sought to repossess the

8    vehicle?

9              MR. HAZAN:    Objection to form.

10     A.    No.

11             MR. KESSLER:    I have nothing further.    Thank

12          you.

13    CONTINUED EXAMINATION BY

14    MR. HAZAN:

15     Q.    I just have one action went over, in Defendants'

16    Exhibit T.   Turning your attention to page 173, the entry

17    dated 6/6/2006, regular payment reversal?

18     A.    Yes.

19     Q.    When Mr. Kessler was questioning you, I believe you

20    testified that payment was received by Honda but then

21    rejected by Honda.   When you say payment was received by

22    Honda, what you do you mean by that?

23     A.    A regular monthly payment.

24     Q.    Does it mean that Honda actually had the money?

25     A.    Yes.